1    BRADLEY S. PHILLIPS (State Bar No. 085263)
     MUNGER, TOLLES & OLSON LLP
2    355 South Grand Avenue, 35th Floor
     Los Angeles, CA 90071-1560
3    Telephone:    (213) 683-9100
     Facsimile:    (213) 687-3702
4

5    MICHELLE FRIEDLAND (State Bar No. 234124)
     KATHRYN EIDMANN (State Bar No. 268053)
     MUNGER, TOLLES & OLSON LLP
6    560 Mission Street, 27th Floor
     San Francisco, CA 94105-2907
7    Telephone:    (415) 512-4000
     Facsimile:    (415) 512-4007
8

9    CHARLES F. ROBINSON (State Bar No. 113197)
     KAREN J. PETRULAKIS (State Bar No. 168732)
10   MARGARET L. WU (State Bar No. 184167)
     OFFICE OF THE GENERAL COUNSEL
     UNIVERSITY OF CALIFORNIA
11   1111 Franklin Street
     Oakland, CA 94607
12   Telephone:    (510) 987-9800
     Facsimile:    (510) 987-9757
13

14   Attorneys for Defendants
     MARK G. YUDOF; THE REGENTS OF
     THE UNIVERSITY OF CALIFORNIA;
15   ROBERT J. BIRGENEAU

16               UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18   JESSICA FELBER                 CASE NO. CV 11-01012 RS
     and BRIAN MAISSY
19                           **NOTICE OF MOTION AND MOTION TO**
                                 **DISMISS OF DEFENDANTS MARK G.**
20         Plaintiffs,         **YUDOF, PRESIDENT OF THE REGENTS**
                                 **OF THE UNIVERSITY OF CALIFORNIA;**
21       vs.                        **THE REGENTS OF THE UNIVERSITY**
                                 **OF CALIFORNIA; ROBERT J.**
22   MARK G. YUDOF, PRESIDENT OF THE    **BIRGENEAU, CHANCELLOR OF THE**
     REGENTS OF THE UNIVERSITY OF       **UNIVERSITY OF CALIFORNIA,**
23   CALIFORNIA, et al.,             **BERKELEY; AND JONATHAN**
                                 **POULLARD, DEAN OF STUDENTS OF**
24         Defendants.       **THE UNIVERSITY OF CALIFORNIA,**
                                 **BERKELEY**
25

26                             Judge:       Hon. Richard Seeborg
                            Dept:        Courtroom 3, 17th Floor
27                             Date:        September 22, 2011
                            Time:        1:30 pm
28

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION ................................................................................................ 2

II.  ALLEGATIONS OF THE FIRST AMENDED COMPLAINT ........................... 4

    A.   Plaintiffs Allege That Protests Against Israeli Policies Occurred on UC Campuses ...................................................................................................... 5

    B.   Plaintiffs Describe Incidents to Which Law Enforcement Authorities Responded ...................................................................................................... 6

    C.   Plaintiffs Allege an Assault by Another Student on Felber ............................ 6

    D.   Plaintiffs Allege Violations of the Federal and California Constitutions and of Federal and State Anti-Discrimination Laws............................................... 7

III. ARGUMENT ...................................................................................................... 7

    A.   Plaintiffs' Complaint Must Be Dismissed if It Fails to State a Legally Cognizable Claim ........................................................................................... 7

    B.   Plaintiffs' Federal Constitutional Claims Fail as a Matter of Law ................ 8

        1.   Plaintiffs' free exercise claim fails because Plaintiffs have not alleged any burden on their practice of religion........................................... 8

        2.   Plaintiffs' freedom of association claim fails because Plaintiffs have not alleged any burden on their ability to peaceably assemble .................. 9

        3.   Failure to protect an individual's First Amendment rights from infringement by third parties is not a basis for constitutional liability ....................................................................................................... 10

        4.   Chancellor Birgeneau and President Yudof are not liable under § 1983 because neither is alleged to have personally participated in the conduct challenged in the Complaint................................................... 11

        5.   The Regents has Eleventh Amendment immunity from Plaintiffs' constitutional claims........................................................................................ 13

    C.   Plaintiffs' § 1983 Claims for Damages Should Be Dismissed on Qualified Immunity Grounds Because Defendants Did Not Violate Any Clearly Established Law ........................................................................................... 13

    D.   Plaintiffs Fail to State a Title VI Claim ....................................................... 15

        1.   Most of the incidents described in the Complaint involved core First Amendment protected speech that UC could not have prohibited ...................................................................................................... 16

            a.   Protecting controversial speech is particularly important in a university setting.............................................................................. 17

            b.   Courts have found university speech codes to be unconstitutional .......................................................................... 18

            c.   The Supreme Court and the United States Department of Education have recognized that there can be no liability for refraining from prohibiting protected speech.............................. 20

**TABLE OF CONTENTS**
(continued)

                                                                                        **Page**

2. Plaintiffs' Title VI claim also fails because Plaintiffs do not allege that Defendants were deliberately indifferent to severe, pervasive, and objectively offensive harassment of them or of Jewish students generally ........................................................................................... 21

    a. Plaintiffs fail to state a Title VI claim because they have not pleaded facts sufficient to state a claim that UC acted with deliberate indifference ............................................................ 23

    b. Plaintiffs cannot recover under Title VI because the incidents they describe cannot reasonably be viewed as harassment of them or others for being Jewish ............................ 24

    c. Most incidents alleged in the Complaint were not witnessed by Plaintiffs, occurred long ago, or are not similar to acts that Plaintiffs personally experienced ............................. 26

3. Plaintiffs fail to state a Title VI claim because they have not alleged that they were denied educational benefits or opportunities ................... 27

E. Felber Lacks Standing to Seek Injunctive Relief ................................................. 30

F. Plaintiffs' State Law Claims Should Be Dismissed ............................................. 30

1. Plaintiffs' state law claims should be dismissed for lack of supplemental jurisdiction ............................................................... 31

2. This Court should abstain from exercising jurisdiction over the California free exercise claim because it raises novel questions of state law ......................................................................................... 31

3. Plaintiffs' Unruh Act claim fails because UC is not a "business establishment" within the meaning of that Act ........................................ 33

4. Plaintiffs' state law claims for injunctive and declaratory relief fail because the UC Defendants have Eleventh Amendment immunity ........ 34

IV. CONCLUSION ............................................................................................................ 35

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**FEDERAL CASES**

4

*Air Transp. Ass'n of Am. v. Pub. Utils. Comm'n of State of Cal.*,

5

    833 F.2d 200 (9th Cir. 1987)...............................................................................................35

6

*al-Kidd v. Ashcroft*,
    580 F.3d 949 (9th Cir. 2009),

7

    *rev'd on other grounds*, 131 S. Ct. 2074 (2011) .................................................................12

8

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)..........................................................................................................22

9

*Alexander v. Univ. of N. Fla.*,

10

    39 F.3d 290 (11th Cir. 1994)............................................................................................15

11

*Armstrong v. Meyers*,

12

    964 F.2d 948 (9th Cir. 1992)............................................................................................13

13

*Ashcroft v. Iqbal*,

14

    129 S. Ct. 1937 (2009) .........................................................................................7, 11, 12

15

*Azul-Pacifico, Inc. v. City of Los Angeles*,
    973 F.2d 704 (9th Cir. 1992)..............................................................................................8

16

*Bair v. Shippensburg Univ.*,

17

    280 F. Supp. 2d 357 (M.D. Pa. 2003) ..............................................................................19

18

*Barnes-Wallace v. City of San Diego*,
    607 F.3d 1167 (9th Cir. 2010)..........................................................................................32

19

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,

20

    457 U.S. 853 (1982)..........................................................................................................18

21

*Bell Atl. Corp. v. Twombly*,

22

    550 U.S. 544 (2007)...................................................................................................7, 8, 9

23

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969)..........................................................................................................19

24

*Brown v. Entm't Merchs. Ass'n*,

25

    -- S. Ct. --, No. 08-1448, 2011 WL 2518809 (June 27, 2011)..............................................18

26

*Bryant v. Indep. Sch. Dist. No. I-38*,

27

    334 F.3d 928 (10th Cir. 2003)..........................................................................................22

28

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Burwell v. Pekin Cmty. High Sch. Dist. 303,*
213 F. Supp. 2d 917 (C.D. Ill. 2002) .................................................................. 29

*Cannon v. Univ. of Chicago,*
441 U.S. 677 (1979) ........................................................................................ 22, 28

*Carnegie-Mellon Univ. v. Cohill,*
484 U.S. 343 (1988) ............................................................................................. 31

*Citizens United v. Fed. Election Comm'n,*
130 S. Ct. 876 (2010) .......................................................................................... 16

*City of Los Angeles v. Lyons,*
461 U.S. 95 (1983) .............................................................................................. 30

*Coll. Republicans at San Francisco State Univ. v. Reed,*
523 F. Supp. 2d 1005 (N.D. Cal. 2007) .................................................. 16, 17, 19

*Creighton v. City of Livingston,*
628 F. Supp. 2d 1199 (E.D. Cal. 2009).............................................................. 32

*Dambrot v. Cent. Mich. Univ.,*
839 F. Supp. 477 (E.D. Mich. 1993), aff'd, 55 F.3d 1177 (6th Cir. 1995)............ 19

*Davis v. Monroe County Bd. of Educ.,*
526 U.S. 629 (1999) ....................................................................................... passim

*DeShaney v. Winnebago County Department of Social Services,*
489 U.S. 189 (1989) ................................................................................. 10, 11, 14

*Doe v. Univ. of Mich.,*
721 F. Supp. 852 (E.D. Mich. 1989)................................................. 16, 18, 19, 34

*Edelman v. Jordan,*
415 U.S. 651 (1974) ........................................................................................... 13

*Finkelshteyn v. Staten Island University Hospital,*
687 F. Supp. 2d 66 (E.D.N.Y. 2009)............................................................ 24, 25

*Fitzgerald v. Barnstable Sch. Comm.,*
129 S. Ct. 788 (2009) ......................................................................................... 22

*Gabrielle M. v. Park Forest-Chicago Heights, IL School District 163,*
315 F.3d 817 (7th Cir. 2003)............................................................................... 28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Gebser v. Lago Vista Indep. Sch. Dist.,*
  524 U.S. 274 (1998).........................................................................................22, 23

*Graham v. C.I.R.,*
  822 F.2d 844 (9th Cir. 1987), aff'd *by Hernandez v. C.I.R.*, 490 U.S. 680 (1989)..................9

*Haitian Refugee Ctr., Inc. v. Baker,*
  953 F.2d 1498 (11th Cir. 1992)..................................................................................10

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982).......................................................................................................14

*Harris v. Forklift Sys. Inc.,*
  510 U.S. 17 (1993)..........................................................................................................24

*Hawkins v. Anheuser-Busch, Inc.,*
  517 F.3d 321 (6th Cir. 2008).................................................................................26, 27

*Hawkins v. Sarasota County School Board,*
  322 F.3d 1279 (11th Cir. 2003)...................................................................................28

*Healy v. James,*
  408 U.S. 169 (1972).......................................................................................................18

*Hernandez v. C.I.R.,*
  490 U.S. 680 (1989)................................................................................................8, 9

*Hobbie v. Unemployment Appeals Comm'n of Fla.,*
  480 U.S. 136 (1987).........................................................................................................9

*Hope v. Pelzer,*
  536 U.S. 730 (2002).......................................................................................................14

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.,*
  515 U.S. 557 (1995).......................................................................................................16

*Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.,*
  993 F.2d 386 (4th Cir. 1993).........................................................................................19

*Jackson v. Hayakawa,*
  682 F.2d 1344 (9th Cir. 1982).......................................................................................13

*Jennings v. Univ. of N.C.,*
  482 F.3d 686 (4th Cir. 2007).........................................................................................28

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Jones v. Williams,*
    297 F.3d 930 (9th Cir. 2002)................................................................ 11

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.,*
    385 U.S. 589 (1967)....................................................................... 18

*Khatib v. County of Orange,*
    No. 07-1012, 2008 WL 822562 (C.D. Cal. Mar. 26, 2008)................... 33

*King v. McMillan,*
    594 F.3d 301 (4th Cir. 2010)......................................................... 26, 27

*Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.,*
    616 F.3d 963 (9th Cir. 2010)............................................................ 13

*Lee v. Wilkinson,*
    No. 09-00722, 2009 WL 2824758 (E.D. Cal. Sept. 1, 2009).............. 32, 33

*May v. Enomoto,*
    633 F.2d 164 (9th Cir. 1980)............................................................ 12

*Melendez-Garcia v. Sanchez,*
    629 F.3d 25 (1st Cir. 2011)......................................................... 11, 14

*Milligan v. Bd. of Trustees,*
    No. 09- 320, 2010 WL 2649917 (S.D. Ill. June 30, 2010)................... 29

*Montgomery v. Indep. Sch. Dist. No. 709,*
    109 F. Supp. 2d 1081 (D. Minn. 2000)............................................. 28

*Montiero v. Tempe Union High School District,*
    158 F.3d 1022 (9th Cir. 1998)......................................................... 22

*Moss v. U.S. Secret Serv.,*
    572 F.3d 962 (9th Cir. 2009).............................................................. 8

*Murrell v. Sch. Dist. No. 1,*
    186 F.3d 1238 (10th Cir. 1999)....................................................... 28

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964)..................................................................... 16

*Nelson v. Streeter,*
    16 F.3d 145 (7th Cir. 1994).............................................................. 10

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) ............................................................................ 30

*Oden v. Marianas Coll.,*
   440 F.3d 1085 (9th Cir. 2006) ......................................................... 23

*Oncale v. Sundowner Offshore Servs., Inc.,*
   523 U.S. 75 (1998) ............................................................................ 24

*Oona R.-S.- by Kate S. v. McCaffrey,*
   143 F.3d 473 (9th Cir. 1998) ........................................................... 12

*Papelino v. Albany Coll. of Pharm. of Union Univ.,*
   633 F.3d 81 (2d Cir. 2011) ......................................................... 24, 26

*Pearson v. Callahan,*
   129 S. Ct. 808 (2009) ....................................................................... 14

*Pennhurst State Sch. & Hosp. v. Halderman,*
   465 U.S. 89 (1984) ............................................................................ 35

*Pietrangelo v. Alvas Corp.,*
   664 F. Supp. 2d 420 (D. Vt. 2009) ................................................. 10

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) .......................................................................... 16

*R.R. Comm'n of Tex. v. Pullman Co.,*
   312 U.S. 496 (1941) .......................................................................... 32

*Ray v. Antioch Unified Sch. Dist.,*
   107 F. Supp. 2d 1165 (N.D. Cal. 2000) ......................................... 29

*Roberts v. Haragan,*
   346 F. Supp. 2d 853 (N.D. Tex. 2004) ...................................... 18, 19

*Roth v. United States,*
   354 U.S. 476 (1957) .......................................................................... 16

*San Jose Christian Coll. v. City of Morgan Hill,*
   360 F.3d 1024 (9th Cir. 2004) ........................................................... 9

*Saucier v. Katz,*
   533 U.S. 194 (2001) .......................................................................... 14

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Saxe v. State Coll. Area Sch. Dist.*,
   240 F.3d 200 (3d Cir. 2001) (Alito, J.) ..................................................... 19, 24, 26

*Schwapp v. Town of Avon*,
   118 F.3d 106 (2d Cir. 1997)...................................................................... 26, 27

*Shotz v. City of Plantation*,
   344 F.3d 1161 (11th Cir. 2003)........................................................................ 15

*Snyder v. Phelps*,
   131 S. Ct. 1207 (2011) ................................................................................. 16, 17

*Sweezy v. State of N.H.*,
   354 U.S. 234 (1957) ........................................................................................ 18

*T.M. ex rel. Benson v. San Francisco Unified Sch. Dist.*,
   No. 09-01463, 2010 WL 291828 (N.D. Cal. Jan. 19, 2010)........................... 15

*Tater-Alexander v. Amerjan*,
   No. 08-00372, 2011 WL 319012 (E.D. Cal. Jan. 28, 2011) .......................... 10

*Taylor v. List*,
   880 F.2d 1040 (9th Cir. 1989)........................................................................ 12

*Texas v. Johnson*,
   491 U.S. 397 (1989)........................................................................................ 17

*Trentadue v. Redmon*,
   619 F.3d 648 (7th Cir. 2010).......................................................................... 28

*United Mine Workers of America v. Gibbs*,
   383 U.S. 715 (1966) ....................................................................................... 31

*UWM Post, Inc. v. Bd. of Regents of the Univ. of Wisc. Sys.*,
   774 F. Supp. 1163 (E.D. Wisc. 1991) ........................................................... 19

*Vance v. Spencer County Pub. Sch. Dist.*,
   231 F.3d 253 (6th Cir. 2000).......................................................................... 28

*Virginia v. Black*,
   538 U.S. 343 (2003)........................................................................................ 19

*Whitfield v. Notre Dame Middle Sch.*,
   No. 09-2649, 2011 WL 94735 (3d Cir. Jan. 12, 2011) ................................. 22

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Will v. Michigan Department of State Police,*
    491 U.S. 58 (1989) .................................................................................................. 13

*Williams ex rel. Hart v. Paint Valley Local Sch. Dist.,*
    400 F.3d 360 (6th Cir. 2005) ................................................................................. 23

*Williams v. Bd. of Regents of Univ. Sys. of Ga.,*
    477 F.3d 1282 (11th Cir. 2007) ....................................................................... 28, 30

STATE CASES

*Catholic Charities of Sacramento, Inc. v. Superior Court,*
    32 Cal. 4th 527 (2004) ........................................................................................... 32

*Corry v. Leland Stanford Junior Univ.,*
    No. 740309 (Cal. Sup. Ct. Feb. 27, 1995) ............................................................ 19

*Curran v. Mount Diablo Council of the Boy Scouts,*
    17 Cal. 4th 670 (1998) ........................................................................................... 34

*Doe v. California Lutheran High School Association,*
    170 Cal. App. 4th 828 (2009) .......................................................................... 33, 34

*Donovan v. Poway Unified Sch. Dist.,*
    167 Cal. App. 4th 567 (2008) ................................................................................ 35

*E. Bay Asian Local Dev. Corp. v. California,*
    24 Cal. 4th 693 (2000) ........................................................................................... 32

*Katzberg v. Regents of the University of California,*
    29 Cal. 4th 300 (2002) ........................................................................................... 33

*Marin Mun. Water Dist. v. Chenu,*
    188 Cal. 734 (1922) ............................................................................................... 34

*North Coast Women's Care Med. Group, Inc. v. Superior Court,*
    44 Cal. 4th 1145 (2008) ......................................................................................... 32

FEDERAL CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ................................................................................................ passim

U.S. Const. amend. XI. ........................................................................................ 4, 13, 34, 35

1

## TABLE OF AUTHORITIES
(continued)

2

Page(s)

3

**STATE CONSTITUTIONAL PROVISIONS**

4

Cal. Const. Art. IX, § 9(f) ............................................................................. 1

5

Cal. Const. Art. I, § 2 ............................................................................... 32

6

Cal. Const. Art. I, § 4 ..................................................................... 31, 32, 33

7

Cal. Const. Art. I, § 7 ............................................................................... 32

8

**FEDERAL STATUTES**

9

28 U.S.C. § 1367................................................................................. 31, 32

10

42 U.S.C. § 1983 ............................................................................... passim

11

42 U.S.C. § 2000d (Title VI of the Civil Rights Act of 1964).............................. passim

12

**STATE STATUTES**

13

Cal. Civil Code § 51 ................................................................................. 33

14

Cal. Gov. Code § 11135............................................................................ 2, 7, 35

15

**FEDERAL RULES**

16

Fed. R. Civ. P. 12(b)(6)....................................................................... 1, 7, 9

17

**FEDERAL REGULATIONS**

18

Department of Education, Racial Incidents and Harassment Against Students at
    Educational Institutions; Investigative Guidance (Mar. 10, 1994),
    59 Fed. Reg. 11448 ....................................................................... 20, 21

19

20

**OTHER AUTHORITIES**

21

22

First Amendment. Gerald A. Reynolds, Office for Civil Rights, First Amendment: Dear
    Colleague (July 28, 2003), *available at* http://www.ed.gov/about/ ........................................ 21

23

Russlyn Ali, Office for Civil Rights, Dear Colleague Letter (Oct. 26, 2010), *available at*
    http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html............................ 22

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION TO DISMISS

2       PLEASE TAKE NOTICE that on September 22, 2011 at 1:30 p.m. before the Honorable

3   Richard Seeborg in Courtroom 3 on the Seventeenth Floor of the above-entitled Court,

4   Defendants Regents of the University of California ("The Regents" or "UC"), Mark G. Yudof,

5   Robert J. Birgeneau, and Jonathan Poullard (collectively, "UC Defendants") will move pursuant

6   to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss all claims brought against

7   them in Plaintiffs' First Amended Complaint ("Complaint" or "Compl."), filed May 18, 2011.[1]

8       The Complaint should be dismissed pursuant to Rule 12(b)(6) for the following reasons:

9       (1) Claims 1 and 3—which allege violations of the rights of free exercise of

10   religion and freedom of assembly under the First Amendment and § 1983—fail to state a

11   claim because Plaintiffs have not alleged a substantial burden on their ability to exercise

12   their religion or any infringement of their ability to assemble to express their views. In

13   addition, state officials cannot be liable for failing to protect un-incarcerated individuals

14   from actions of other private individuals, even when those actions may affect the exercise

15   of constitutional rights. Moreover, Defendants Birgeneau and Yudof cannot be liable

16   under § 1983 because Plaintiffs have not alleged that either Defendant personally

17   participated in or even had knowledge of the incidents alleged in the Complaint.

18       (2) Claim 6—which alleges a violation of Title VI of the Civil Rights Act of

19   1964—fails to state a claim because (a) it is premised on the allegation that the UC

20   Defendants should have prohibited First Amendment protected speech; (b) Plaintiffs have

21   not alleged that the University was deliberately indifferent to conduct that went beyond

22   protected speech and involved threats or violence; (c) Plaintiffs have not alleged "severe,

23   pervasive, and objectively offensive" harassment; and (d) Plaintiffs have not alleged that

24   they were deprived of any educational opportunities.

25

26   [1] Although the Complaint twice refers to UC Berkeley as a Defendant (*see* Compl. 4:4; 4:27),
Plaintiffs' counsel have stated in writing that they did not intend to sue it separately. UC Berkeley
27   is an operating unit of The Regents and so is not separately subject to suit. *See* Cal. Const. Art.
IX, § 9(f) (stating that The Regents is the entity authorized to "sue and be sued" on behalf of the
28   University of California).

UC DEFENDANTS' NOTICE OF MOT.
AND MOT. TO DISMISS
CASE NO. 11-CV-01012- RS

1    (3) Claims 2, 5, and 6—which allege violations of the free exercise clause of the

2    California Constitution, the California Unruh Act, and California Government Code

3    section 11135, respectively—should be dismissed because there is no reason to exercise

4    federal jurisdiction over purely state law claims once the federal claims are dismissed. In

5    addition, the Court should abstain from exercising jurisdiction over Claim 2 because it

6    presents novel questions of state law; dismiss Claim 5 because the University of

7    California is not a business establishment within the meaning of the Unruh Act; and

8    dismiss Claim 6 because it seeks only injunctive and declaratory relief and the UC

9    Defendants have immunity in federal court from claims for injunctive and declaratory

10   relief based on violations of state law.

11   This Motion is based upon the Memorandum of Points and Authorities included herein and such

12   additional authority and argument as may be presented in Defendants' reply and at any hearing on

13   this Motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

16   Plaintiffs allege in their Complaint that the University of California violated their right to

17   freely exercise their Jewish religion and their right to assemble and that it discriminated against

18   them on the basis of their religion. But this lawsuit is in substance an attempt by Plaintiffs to

19   compel UC to restrict the freedom of speech and assembly of its other students, in violation of

20   *their* First Amendment rights. Plaintiffs' principal complaint is that UC has permitted its students

21   to engage in political demonstrations and protests against Israel and in support of Palestinian

22   causes. With one exception, these alleged demonstrations and protests were not targeted at either

23   Plaintiff, and Plaintiffs have not even alleged they were present when most of the alleged events

24   took place. Indeed, the majority of the events alleged in the Complaint occurred either long before

25   Plaintiffs enrolled as students at UC Berkeley or at took place at other campuses altogether.

26   Plaintiffs should not be permitted to use meritless claims of infringement of their rights as part of

27   an effort to stifle the free speech and assembly rights of others.

28   Plaintiffs' federal constitutional claims fail as a matter of law because Plaintiffs have not

UC DEFENDANTS' NOTICE OF MOT.
AND MOT. TO DISMISS
CASE NO. 11-CV-01012- RS

1   alleged any burden, let alone a substantial burden, on their ability to exercise their religion or any

2   infringement of their ability to assemble to express their views. To the extent Plaintiffs allege that

3   the UC Defendants failed to prevent private individuals from taking actions that affected

4   Plaintiffs' ability to exercise their rights to free exercise of religion and assembly, that allegation

5   does not support a constitutional claim. The § 1983 claims against Chancellor Birgeneau and

6   President Yudof must also be dismissed because Plaintiffs have not alleged that either Defendant

7   personally participated in any alleged deprivation of rights. The constitutional claims against The

8   Regents must be dismissed for the additional reason that The Regents is an arm of the state and

9   therefore has sovereign immunity and cannot be sued under 42 U.S.C. § 1983, and the claims for

10  damages against Defendants Yudof, Birgeneau, and Poullard should be dismissed on the basis of

11  qualified immunity, because their alleged actions did not violate clearly established law.

12          Plaintiffs' Title VI claim must be dismissed because UC cannot be liable for allowing its

13  students to engage in speech and assembly that are protected by the First Amendment. The

14  majority of the incidents described in the Complaint involve the type of political and social

15  advocacy that lies at the core of First Amendment protection, and courts have repeatedly

16  recognized that vigorous protection of free speech is particularly important in the university

17  setting. Indeed, courts that have considered rules enacted to limit derogatory or controversial

18  speech at a public university have routinely struck them down as incompatible with the First

19  Amendment. UC may not be held liable under Title VI for allowing speech that it could not have

20  prohibited without violating the First Amendment. Further, Plaintiffs have not alleged that the UC

21  Defendants were deliberately indifferent to actions of which they were aware and which involved

22  threats or violence rather than protected speech.

23          Plaintiffs' Title VI claim fails for the independent reasons that the incidents alleged in the

24  Complaint do not amount to "severe, pervasive, and objectively offensive" harassment of

25  Plaintiffs or of Jewish students generally and that Plaintiffs do not allege that they have been

26  deprived "of access to the educational opportunities or benefits provided by the school." *Davis v.*

27  *Monroe County Bd. of Educ.*, 526 U.S. 629, 650 (1999). The Title VI claim against the individual

28  defendants must be dismissed for the additional reason that Title VI provides a remedy against

1   only programs or activities that receive federal funding, not individuals. Moreover, all of Felber's

2   claims for injunctive relief must be dismissed because she is no longer a student at UC and so

3   does not have standing to seek injunctive relief.

4          Given that all of Plaintiffs' federal claims should be dismissed, this Court should decline

5   to exercise supplemental jurisdiction over any of Plaintiffs' state law claims. In the alternative:

6   the Court should abstain from exercising jurisdiction over Plaintiffs' free exercise claim under the

7   California Constitution because it presents novel questions of California law; Plaintiffs' Unruh

8   Act claim should be dismissed because UC is not a business establishment within the meaning of

9   that Act; and Plaintiffs' state law claims for injunctive and declaratory relief, including Plaintiffs'

10  entire Government Code claim, should be dismissed for lack of federal jurisdiction because the

11  UC Defendants have Eleventh Amendment immunity.

12  **II.    ALLEGATIONS OF THE FIRST AMENDED COMPLAINT**

13         Plaintiffs Brian Maissy, a current UC Berkeley student, and Jessica Felber, who graduated

14  from UC Berkeley in December 2010 (Compl. ¶ 15), claim that Defendants—The Regents, UC

15  President Yudof, UC Berkeley Chancellor Birgeneau, UC Berkeley Dean of Students Poullard,

16  and the Associated Students of UC—violated Plaintiffs' right to freely exercise their Jewish

17  religion and their right to assemble, and that Defendants discriminated against them on the basis

18  of their religion. But the Complaint contains no allegations about Plaintiffs' religious beliefs or

19  practices, let alone any allegation that Defendants prevented them from exercising their religion;

20  no allegation that Maissy or Felber was ever prevented from assembling to express his or her

21  views or religious beliefs; and no allegation that Defendants treated Plaintiffs differently than

22  other students, let alone on the basis of their religion. Instead, the Complaint describes various

23  protests and demonstrations against Israel, most of which occurred somewhere other than UC

24  Berkeley and/or before Plaintiffs enrolled at UC. Plaintiffs contend that, by allowing these

25  protests and demonstrations to occur, "defendants[] tolera[ted] the development of a dangerous

26  anti-Semitic climate on its campuses . . . which . . . threatens and endangers the health and safety

27  of University of California's Jewish students." (*Id.* at 3:14-18.)

28

**A.** **Plaintiffs Allege That Protests Against Israeli Policies Occurred on UC Campuses.**

Plaintiffs allege that the Students for Justice in Palestine ("SJP") and the Muslim Students Association ("MSA"), two University of California student groups, have engaged in a number of political demonstrations on UC campuses in opposition to Israeli policies. (*See id.* ¶¶ 27-29, 40, 42, 43, 45, 48.)[2] Plaintiffs allege, for example, that in 2002 SJP and MSA students at UC Irvine displayed "mock 'body bags' of Palestinians claimed to have been 'murdered' by the Israeli army" (*id.* ¶ 45), and that in 2008 SJP sponsored a "die-in" at UC Berkeley in response to the launching of Israeli rockets into Palestinian territories. (*Id.* ¶ 48.) In addition, Plaintiffs allege that in 2002 SJP and MSA students at UCLA and UC Irvine published a "highly anti-Israel" newsmagazine (*id.* ¶ 46) and that, in the same year, UC Berkeley offered an English course entitled "The Politics and Poetics of Palestinian Resistance." (*Id.* ¶ 47.) Plaintiffs further allege that in 2000 the SJP "called for an international boycott of all Israeli products and an end to U.S. economic supported Israel" (*id.* ¶ 26) and that in 2010 SJP helped organize an event that focused on "promot[ing] a boycott of Israeli academic institutions as well as . . . corporations which do business with Israel." (*Id.* ¶ 56.)

Plaintiffs further allege that SJP and MSA students have set up mock checkpoints at UC Berkeley to imitate those utilized by Israeli soldiers. (*Id.* ¶¶ 27, 40.) Plaintiffs allege that, at these "checkpoints," "students dress as soldiers, carry realistic-looking [guns]," "lay barbed wire on heavily traveled campus walkways, and interrogate others about their religious affiliation and national origins." (*Id.* ¶ 59.) Plaintiffs claim that, during one mock checkpoint demonstration, a student in a wheelchair became accidentally entangled in barbed wire that was part of the demonstration. (*Id.* ¶ 27.) Plaintiffs attach in Exhibit A to their Complaint, however, an email in which Dean Poullard states that the protesters themselves "quickly assist[ed] the person in passing the checkpoint" and then "placed one of their members in the area to further assist any

---

[2] Plaintiffs allege that, at one of these political demonstrations, a Jewish observer was spat on by a demonstrator. (Compl. ¶ 42.) The Complaint itself, however, states that "[s]tudents from several northern California campuses" took part in this demonstration, and it does not allege that either the perpetrator or the victim of the spitting incident was a UC student. (*Id.*)

other individuals in passing the demonstration." (Ex. A ¶ 15 (Declaration of Brian Massey).)

B.    **Plaintiffs Describe Incidents to Which Law Enforcement Authorities Responded.**

Plaintiffs contend that SJP and/or MSA students have disrupted speakers perceived to be pro-Israel or anti-Muslim (*id.* ¶¶ 29, 53, 54) and a concert organized by a pro-Israel group. (*Id.* ¶ 49.)[3] Plaintiffs allege that law enforcement authorities responded to all of these incidents. Plaintiffs allege that, in three of the incidents, campus police intervened. (*Id.* ¶¶ 49, 53, 54.) Plaintiffs allege that the fourth incident led the Orange County District Attorney to prosecute the students involved. (*Id.* ¶ 29.)[4]

C.    **Plaintiffs Allege an Assault by Another Student on Felber.**

Plaintiffs characterize the range of activities by SJP and MSA described above as "campus terrorist incitement," "pro-terrorist programs, goals and conduct," and "harassment and intimidation." (Compl. ¶ 17.) Plaintiffs claim that Defendants' policies "fostered and encouraged" these activities and led to an alleged "assault" on Felber. (*Id.*)

Specifically, Plaintiffs allege that Felber was assaulted on the UC Berkeley campus on March 5, 2010, by Berkeley student and SJP member Husam Zakharia. (*Id.* ¶ 18.) Plaintiffs allege that Felber was holding a placard that read "Israel Wants Peace" when Zakharia deliberately hit her with a shopping cart, causing her injury that required medical attention. (*Id.* ¶¶ 18, 20.) According to Plaintiffs, Zakharia did this "to vent his hostility toward the non-violent message stated in her placard and her Jewish identity." (*Id.* ¶ 19.) Plaintiffs allege that, although Felber obtained a permanent restraining order to keep Zakharia away from her, she was subsequently fearful to walk on campus alone. (*Id.* ¶ 20.) Plaintiffs do not allege that either law enforcement authorities or UC failed to respond to this incident.

Plaintiffs further allege that Zakharia had previously spat and yelled at Felber during a political demonstration (*id.* ¶ 21) and that Zakharia and two others had been cited by the UC

---

[3] It appears that paragraphs 41 and 49 of the Complaint may describe the same event.

[4] Plaintiffs also claim that, during the 2001-2002 academic year, a member of a Jewish religious group at Berkeley was assaulted and the Hillel was vandalized. (*Id.* ¶ 44.) Plaintiffs do not claim that law enforcement authorities or UC failed to respond to those alleged incidents.

Campus police for battery against another Jewish UC Berkeley student in November 2008. (*Id.* ¶ 41.)

**D.    Plaintiffs Allege Violations of the Federal and California Constitutions and of Federal and State Anti-Discrimination Laws.**

Plaintiffs allege that the SJP and MSA activities described in the Complaint are "terrifying" (*id.* ¶ 59) and "make Jewish students feel particularly endangered, intimidated, and harassed." (*Id.* at 3:24-25, *see also id.* at 2:17, ¶ 56.) Plaintiffs allege that, by failing to "adopt and implement policies, regulations, and student organization procedures" to prevent these activities (*id.* at 3:15-16) and failing to impose "effective disciplinary proceedings" in response to these activities (*id.* ¶ 51), Defendants have violated their rights in the following ways:

Plaintiffs allege that Defendants' conduct violated their rights under the federal and California Constitutions to freely exercise their religion. (*Id.* ¶¶ 62-64, 65-67, 68-71.) Plaintiffs also claim that Defendants violated their federal constitutional right to freedom of assembly. (*Id.* ¶ 69.) Plaintiffs further claim that Defendants discriminated against them in violation of Title VI of the Civil Rights Act of 1964 (*id.* ¶¶ 80-81), California's Unruh Act (*id.* ¶ 74-79), and California Government Code § 11135. (*Id.* ¶ 82-83.) Plaintiffs request damages (*id.* at 22:18-21), declaratory and injunctive relief (*id.* at 22:24-23:12), and attorneys' fees and costs. (*Id.* at 22:22-23; 23:15-16.)

## III.    ARGUMENT

**A.    Plaintiffs' Complaint Must Be Dismissed if It Fails to State a Legally Cognizable Claim.**

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the Court to dismiss a complaint that fails to state a claim upon which relief may be granted. The Supreme Court has emphasized that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (holding that *Twombly* standards apply in all cases). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Thus, to survive a motion to dismiss, a complaint must plead "enough facts to

state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief.").

### B.   Plaintiffs' Federal Constitutional Claims Fail As a Matter of Law.

Plaintiffs' first claim for relief asserts a violation of the First Amendment's Free Exercise Clause (Compl. ¶¶ 62-64), and their third claim for relief asserts a cause of action under 42 U.S.C. § 1983 for violation of the First Amendment's Free Exercise and Freedom of Assembly Clauses. (*Id.* ¶¶ 68-71).[5] It is well established that there is no cause of action directly under the United States Constitution and that a § 1983 cause of action is the proper means for asserting a violation of federal constitutional rights. *See, e.g.*, *Azul-Pacifico, Inc. v. City of Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992). These claims are therefore redundant. Regardless, Plaintiffs' constitutional claims fail on their merits because Plaintiffs have not alleged a substantial burden on their ability to exercise their religion or any infringement of their ability to assemble to express their views. To the extent Plaintiffs allege that the UC Defendants failed to prevent private individuals from taking actions that affect Plaintiffs' rights to free exercise of religion and assembly rights, that allegation does not support a constitutional claim.

### 1.   Plaintiffs' free exercise claim fails because Plaintiffs have not alleged any burden on their practice of religion.

Plaintiffs' free exercise claim fails because they do not allege that Defendants have placed any burden on Plaintiffs' exercise of their religion, let alone the sort of substantial burden that would be required to state a free exercise claim. As the Supreme Court has explained, "[t]he free exercise inquiry asks [first] whether government has placed a *substantial burden* on the observation of a central religious belief or practice." *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989) (emphasis added). Plaintiffs' conclusory allegation that Defendants' "failure to adequately secure and monitor the hostile campus environment prohibits Plaintiffs from the free exercise of

---

[5] The caption of the Complaint also lists § 1985, but, because § 1985 is not mentioned in the body of the Complaint, the UC Defendants assume the Plaintiffs are not actually asserting a § 1985 claim.

their religion" (Compl. ¶ 63) does not meet this standard.

Plaintiffs do not allege that Defendants interfered at all with Plaintiffs' ability to observe any tenet or belief central to their religious faith. Plaintiffs have not alleged, nor could they allege, that Defendants have required anything "proscribed by a religious faith" or forbidden anything "mandated by religious belief," as would be required to make out a violation of the Free Exercise Clause. *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141 (1987) (internal quotation marks omitted); *see also Graham v. C.I.R.*, 822 F.2d 844, 850-51 (9th Cir. 1987) ("To show a free exercise violation, the religious adherent . . . has the obligation to prove that a governmental regulatory mechanism . . . pressur[es] him or her to commit an act forbidden by the religion or . . . prevent[s] him or her from engaging in conduct . . . which the faith mandates."), *aff'd by Hernandez v. C.I.R.*, 490 U.S. 680 (1989).  Indeed, not a single allegation in the Complaint relates to Plaintiffs' practice of their religion. Plaintiffs' free exercise claim therefore must be dismissed. *See Twombly*, 550 U.S. at 555 ("[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions" ).

### 2.    **Plaintiffs' freedom of association claim fails because Plaintiffs have not alleged any burden on their ability to peaceably assemble.**

In their Third Claim for Relief, Plaintiffs allege that Defendants deprived Plaintiffs of their right to freedom of assembly. (Compl. ¶ 69.) Here too, however, the Complaint contains no factual allegations in support of the claim. To violate the Assembly Clause, government restrictions must "impose[] a serious burden upon" or "substantially restrain[]" assembly rights. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1033 (9th Cir. 2004) (holding that a zoning ordinance did not restrict a congregation's assembly rights because the congregants could assemble in a different location). Plaintiffs have not alleged that Defendants did anything whatsoever to interfere with their right to assemble. Again, the mere conclusory assertion that "Defendants . . . deprived plaintiffs of their right . . . of their freedom of assembly" is insufficient to defeat a motion to dismiss. *See Twombly*, 550 U.S. at 555.

1

2

**3.    Failure to protect an individual's First Amendment rights from infringement by third parties is not a basis for constitutional liability.**

3

Even if Plaintiffs had alleged some burden on their exercise of religion or ability to

4

assemble, the alleged source of that burden would be the alleged assault on Felber by Zakharia

5

and/or the acts of other SJP and MSA members. Government actors are not, however, liable for

6

failure to protect individuals from interference by third parties with their exercise of First

7

Amendment rights. This principle is derived from *DeShaney v. Winnebago County Department of*

8

*Social Services*, 489 U.S. 189, 197-200 (1989), in which the Supreme Court held that the Due

9

Process Clause does not impose an affirmative duty on the state to protect a person from private

10

violence unless that person is in state custody. Courts have applied *DeShaney*'s reasoning in the

11

First Amendment context, holding that the state does not have an affirmative obligation to assist

12

citizens in exercising their First Amendment rights. For example, in *Pietrangelo v. Alvas Corp.*,

13

664 F. Supp. 2d 420 (D. Vt. 2009), plaintiff alleged that he was assaulted while picketing and

14

sued the city for failing to protect his exercise of First Amendment rights. *Id.* at 432-33. The

15

court, construing the complaint as asserting a substantive due process claim, held that the state

16

had no affirmative duty to protect the individual against private violence, regardless of whether he

17

was exercising his First Amendment rights at the time. *Id.*; *see also Haitian Refugee Ctr., Inc. v.*

18

*Baker*, 953 F.2d 1498, 1513-14 (11th Cir. 1992) ("[t]he Constitution, however, does not require

19

the Government to assist the holder of a constitutional right in the exercise of [the] right" of

20

freedom of associate); *Tater-Alexander v. Amerjan*, No. 08-00372, 2011 WL 319012, at *13

21

(E.D. Cal. Jan. 28, 2011) (police officers do not have an "affirmative obligation to investigate a

22

crime in a particular way or to protect one citizen from another even when one citizen deprives

23

the other of liberty of property" in order to protect the citizen's First Amendment right to petition

24

the Government for a redress of grievances); *see also Nelson v. Streeter*, 16 F.3d 145, 150 (7th

25

Cir. 1994) (suggesting that *DeShaney* could be read to "imply that the police do not have a

26

constitutionally enforceable duty to protect an artist and the populace from a mob" angry about

27

the content of the artist's work). As these cases make clear, the state has no affirmative duty to

28

protect individuals, such as Plaintiffs, from interference with their First Amendment rights by

1    third-parties.

2         Here, Plaintiffs' claim is not that Defendants took any affirmative act that infringed on

3    their free exercise or assembly rights, but rather that Defendants failed to "adequately secure and

4    monitor the hostile campus environment" that Plaintiffs claim was created by the alleged acts of

5    Zakharia and other members of the SJP and MSA. Under *DeShaney* and its progeny, this theory

6    fails to state a constitutional claim.[6]

7    ## 4.  Chancellor Birgeneau and President Yudof are not liable under § 1983 because neither is alleged to have personally participated in the conduct challenged in the Complaint.

8

9         Plaintiffs' § 1983 claim against Chancellor Birgeneau and President Yudof should be

10   dismissed for the additional reason that the Complaint does not allege that either Defendant

11   personally deprived Plaintiffs of their free exercise or assembly rights. The Supreme Court has

12   held that "vicarious liability is inapplicable to . . . § 1983 suits, [so] a plaintiff must plead that

13   each Government-official defendant, through the official's own individual actions, has violated

14   the Constitution." *Iqbal*, 129 S. Ct. at 1948; *see also Jones v. Williams*, 297 F.3d 930, 934 (9th

15   Cir. 2002) ("[I]n order for a person acting under color of state law to be liable under section 1983

16   there must be a showing of personal participation in the alleged rights deprivation."). Plaintiffs do

17   not allege that Chancellor Birgeneau or President Yudof personally engaged in any

18   unconstitutional actions or inactions. Even if Plaintiffs' constitutional theories otherwise had

19   merit, Plaintiffs do not even allege that either Defendant personally failed to protect Jewish

20   students at UC Berkeley or to adequately discipline students for any alleged wrongdoing. The

21   only reference to Chancellor Birgeneau in the Complaint is that he "commented on the need to

22   limit hate speech which incites violence." (Compl. ¶ 52.) The only reference to President Yudof

23   states that he "declined to commit to minimum protections of Jewish students against SJP and

24   MSA harassment, at a recent November 10, 2010 conference *at UC Irvine*," (*id.* ¶ 51 (emphasis

25   ---

26   [6] To the extent Plaintiffs' allegations focus on Defendants' purported failure to protect Ms. Felber from a physical attack by another student, courts have construed similar claims as substantive due process claims and have rejected them under *DeShaney*. *See, e.g.*, *Melendez-Garcia v. Sanchez*,

27   629 F.3d 25, 36 (1st Cir. 2011) ("A state's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.") (quoting *DeShaney*, 489 U.S.

28   at 197).

1   added)), but Plaintiffs do not claim that President Yudof was even aware of, much less failed to

2   adequately respond to, any incidents that occurred at UC Berkeley.

3       Nor can Defendants Birgeneau and Yudof be held liable for their subordinates' alleged

4   failure to adequately respond to the incidents cited by Plaintiffs. Under § 1983, supervisors are

5   not vicariously liable for the wrongful acts of their employees. *See Iqbal*, 129 S. Ct. at 1949 ("In a

6   § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the

7   term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official,

8   his or her title notwithstanding, is only liable for his or her own misconduct."). Accordingly,

9   Plaintiffs' contention that Dean Poullard met with students "as an agent of all other Defendants"

10  (Compl. ¶ 21) is inapposite. Rather, "a supervisor is only liable for constitutional violations of his

11  subordinates if the supervisor participated in or directed the violations, or knew of the violations

12  and failed to act to prevent them." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). For

13  example, the Ninth Circuit has held that a prison inmate who was allegedly denied medical

14  treatment had no § 1983 claim against the Director of Prisons because there was no claim that the

15  director was either "involved or knowledgable." *May v. Enomoto*, 633 F.2d 164, 167 (9th Cir.

16  1980). Similarly here, Defendants Birgeneau and Yudof cannot be culpable for failing to

17  adequately respond to events of which they are not even alleged to have had knowledge. *See*

18  *Oona R.-S.- by Kate S. v. McCaffrey*, 143 F.3d 473, 477-78 (9th Cir. 1998) ("A supervisor may be

19  found liable under § 1983 if the supervisor is aware of a specific risk of harm to the plaintiff."

20  (internal quotation marks omitted)).[7]

21

22

23

---

24  [7] The Ninth Circuit has also found that supervisors may be held liable "for culpable action or
    inaction in training, supervision, or control of subordinates," "for acquiescence in the
25  constitutional deprivation by subordinates" or "for conduct that shows a reckless or callous
    indifference to the rights of others." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964-65 (9th Cir. 2009),
26  *rev'd on other grounds*, 131 S. Ct. 2074 (2011). Plaintiffs have not alleged that any of the
    incidents alleged in the Complaint resulted from inadequate training or supervision. Given that
27  Plaintiffs have not alleged that either Chancellor Birgeneau or President Yudof knew of—or even
    had reason to know of—any alleged deprivation of constitutional rights, they cannot be liable
28  under any of these alternative liability tests.

UC DEFENDANTS' NOTICE OF MOT.
AND MOT. TO DISMISS
CASE NO. 11-CV-01012- RS

5.      **The Regents has Eleventh Amendment immunity from Plaintiffs' constitutional claims.**

Because The Regents is an arm of the state, it has sovereign immunity from all claims brought by individuals in federal court, unless the claim is brought pursuant to a federal statute that expressly abrogates states' sovereign immunity, or unless The Regents consents to suit, which it has not done here. *Jackson v. Hayakawa*, 682 F.2d 1344, 1350 (9th Cir. 1982) ("[T]he Board of Regents [is] considered to be [an] instrumentalit[y] of the state for purposes of the Eleventh Amendment."); *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974) ("[T]his Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.").

In *Will v. Michigan Department of State Police*, 491 U.S. 58, 64 (1989), the Supreme Court held that § 1983 does not abrogate states' sovereign immunity (holding that a state is not a "person" against whom an action may be brought under § 1983). It is thus firmly settled that, as an arm of the State of California, The Regents is not subject to suit under § 1983. *See, e.g.*, *Armstrong v. Meyers*, 964 F.2d 948, 949-50 (9th Cir. 1992) (The Regents "is an arm of the state for Eleventh Amendment purposes, and therefore is not a 'person' within the meaning of" 42 U.S.C. § 1983). For this additional reason, Plaintiffs' constitutional claims against The Regents must be dismissed.

C.      **Plaintiffs' § 1983 Claims for Damages Should Be Dismissed on Qualified Immunity Grounds Because Defendants Did Not Violate Any Clearly Established Law.**

For the reasons discussed above, Plaintiffs' constitutional claims are meritless and barred by the Eleventh Amendment. In the alternative, the constitutional claims for damages against President Yudof, Chancellor Birgeneau, and Dean Poullard (the "Individual Defendants") should be dismissed on the basis of qualified immunity, because the rights Plaintiffs claim were violated were far from clearly established.

"State officials are entitled to qualified immunity from suits for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Krainski v. Nev. ex rel. Bd. of Regents of Nev. Sys. of*

1    *Higher Educ.*, 616 F.3d 963, 968 (9th Cir. 2010) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818

2    (1982)). To determine whether an official is entitled to qualified immunity, courts ask: (1)

3    whether, taken in the light most favorable to the party asserting the injury, the facts alleged show

4    the official's conduct violated a constitutional right; and (2) if so, whether the right was clearly

5    established in light of the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

6    "For a constitutional right to be clearly established, its contours must be sufficiently clear that a

7    reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*,

8    536 U.S. 730, 739 (2002) (internal quotation marks omitted). It is within a court's "sound

9    discretion" to address these two prongs in any sequence it sees fit. *Pearson v. Callahan*, 129 S.

10   Ct. 808, 818 (2009). Here, a reasonable official in any of the Individual Defendants' positions

11   would have had no reason to think anything he was doing or refraining from doing violated

12   Plaintiffs' constitutional rights.

13         Plaintiffs' free exercise and assembly claims are so conclusory that it is hard to know what

14   Plaintiffs' supporting theories even could be. But we are unaware of any free exercise or freedom

15   of assembly case discussing allegations anything like those Plaintiffs have asserted here, let alone

16   clearly established precedent in Plaintiffs' favor.

17         Moreover, cases in the due process context based on allegations that university officials

18   failed to protect the plaintiffs from violence by students have found that the university officials

19   had qualified immunity. For example, in *Melendez-Garcia v. Sanchez*, 629 F.3d 25 (1st Cir.

20   2010), an ROTC officer was assaulted during a student protest at the University of Puerto Rico

21   and sued university officials under § 1983 for alleged failure to adequately provide security for

22   the ROTC. The First Circuit held that the university officials were entitled to qualified immunity

23   on the § 1983 claims because, under *DeShaney*, "[a] state's failure to protect an individual against

24   private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 36

25   (quoting *DeShaney*, 489 U.S. at 197). The court recognized that "a university, like a local

26   government, must choose how to use limited resources," and thus it would not have been clear to

27   a reasonable official that the university's security decisions violated the Plaintiffs' right to

28   substantive due process. *Melendez-Garcia*, 629 F.3d at 37. Similarly, the Eleventh Circuit held

that university officials were entitled to qualified immunity against a claim that they deprived a student killed in a school shooting of due process rights by failing to protect him from the known threats of another student. *Alexander v. Univ. of N. Fla.*, 39 F.3d 290, 292 (11th Cir. 1994).

**D.    Plaintiffs Fail to State a Title VI Claim.**

Plaintiffs' allegations fail to state a Title VI claim. As an initial matter, because Title VI applies only to "program[s] or activit[ies] receiving Federal financial assistance," 42 U.S.C. § 2000d, "Title VI . . . precludes liability against those who do not receive federal funding, including individuals." *Shotz v. City of Plantation*, 344 F.3d 1161, 1170 (11th Cir. 2003); *see also T.M. ex rel. Benson v. San Francisco Unified Sch. Dist.*, No. 09-01463, 2010 WL 291828, at *4 (N.D. Cal. Jan. 19, 2010). Thus, the Title VI claim against the Individual Defendants must be dismissed.

Plaintiffs' Title VI claim against The Regents also fails because: (1) it is based primarily on Plaintiffs' objections to student protests against Israel, and UC cannot be liable for allowing speech that UC could not have prohibited without violating the First Amendment; (2) Plaintiffs have not sufficiently alleged that the University acted with "deliberate indifference" to conduct involving threats or violence rather than pure speech; (3) the alleged incidents described in the Complaint do not amount to "severe, pervasive, and objectively offensive" harassment of Plaintiffs or of Jewish students generally, *Davis*, 526 U.S. at 650; and (4) Plaintiffs do not allege that they have been deprived "of access to the educational opportunities or benefits provided by the school," *id.*  Most of the incidents complained of involved protected speech that UC could not legally prohibit and so cannot be a basis for liability under Title VI.

The majority of Plaintiffs' allegations describe political speech that is protected by the First Amendment and that UC therefore could not prohibit or punish. As the Supreme Court has emphasized, an entity that receives federal funds may be liable for acts committed by third parties "only where the funding recipient has some control over the alleged harassment. A recipient cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Davis*, 526 U.S. at 644. This is precisely the situation here: the University lacked any authority to discipline SJP and MSA students for exercising their right to engage in protected speech. Indeed,

"principles of the First Amendment 'acquire a special significance in the university setting, where the free and unfettered interplay of competing views is essential to the institution's educational mission.'" *Coll. Republicans at San Francisco State Univ. v. Reed*, 523 F. Supp. 2d 1005, 1015-16 (N.D. Cal. 2007) (quoting *Doe v. Univ. of Mich.*, 721 F. Supp. 852, 863 (E.D. Mich. 1989)).

### 1.    Most of the incidents described in the Complaint involved core First Amendment protected speech that UC could not have prohibited.

The First Amendment "'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes.'" *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 269 (1964) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). Accordingly, the Supreme Court's "First Amendment decisions have created a rough hierarchy in the constitutional protection of speech" in which "[c]ore political speech occupies the highest, most protected position." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring in judgment); *see also Citizens United v. Fed. Election Comm'n,* 130 S. Ct. 876, 904 (2010) ("If the First Amendment has any force, it prohibits [the government] from fining or jailing citizens, or associations of citizens, for simply engaging in political speech.").

Just this Term, the Supreme Court found that highly offensive placards held at a soldier's funeral, with messages such as "God Hates the USA/Thank God for 9/11," "Fags Doom Nations," "Thank God for Dead Soldiers," and "Priests Rape Boys," were "speech . . . at a public place on a matter of public concern" and therefore "entitled to 'special protection' under the First Amendment." *Snyder v. Phelps*, 131 S. Ct. 1207, 1216-17, 1219 (2011). The Court explained: "Such speech cannot be restricted simply because it is upsetting or arouses contempt. . . . '[T]he point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.'" *Id.* at 1219 (quoting *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995)).

Plaintiffs' own allegations make clear that the majority of the incidents about which Plaintiffs complain consisted of students engaging in speech on controversial political matters—speech which is at the core of First Amendment protection. (*See, e.g.*, Compl. ¶¶ 26-28, 40, 42, 45-48, 56.) Many of the incidents cited in Plaintiffs' Complaint involved speech in

1    opposition to Israeli policies—for example, publishing a magazine that analogized Israeli policies

2    to "Apartheid" and "promote[d] both Hamas and Hizbullah as legitimate and noteworthy

3    resistance movements"—and which thus plainly related to matters of public concern. (*Id.* ¶ 46;

4    *see also id.* ¶¶ 27, 40, 42, 45, 47, 48.)

5         That several of the alleged demonstrations involved not only speech but also provocative,

6    expressive conduct does not take the demonstrations outside the First Amendment's protection.

7    For example, Plaintiffs allege that students set up mock checkpoints to imitate those utilized by

8    Israeli soldiers (*id.* ¶¶ 27, 40), displayed mock "body bags" of Palestinians "murdered" by the

9    Israeli army (*id.* ¶ 45), and held a "Die-In" in response to Israeli rocket launches into Palestinian

10   territories (*id.* ¶ 48). These public displays are analogous, for constitutional purposes, to an

11   "illegal immigration bake sale" held by College Republicans that this Court recognized as First

12   Amendment protected speech in *Reed*. *See* 523 F. Supp. 2d at 1018. During the bake sale

13   discussed in *Reed*, buyers were forced to reach through or climb over chain-link fences to

14   purchase baked goods. *Id.* at 1018 n.7. This Court observed that such expressive conduct can be

15   more likely to "reach and be understood by its intended audience" in part because it "obviously

16   [and] cleverly . . . varies from oft-used means or commonly occurring forms of communication."

17   *Id.* at 1018.

18        The fact that Plaintiffs may have been upset by speech critical of Israel does not make it

19   illegal harassment rather than protected speech. To the contrary, as the Supreme Court recently

20   emphasized in *Snyder*, "[i]f there is a bedrock principle underlying the First Amendment, it is that

21   the government may not prohibit the expression of an idea simply because society finds the idea

22   itself offensive or disagreeable." *Snyder*, 131 S. Ct. at 1219 (quoting *Texas v. Johnson*, 491 U.S.

23   397, 414 (1989)). Indeed, in *Reed*, this Court suggested that "seem[ing] disrespectful and

24   offensive" are sometimes the "very characteristics . . . critical to [a demonstration's]

25   effectiveness." *Id.* at 1019.

26              **a.    Protecting controversial speech is particularly important in a
                        university setting.**

27

28   The Supreme Court has repeatedly recognized that freedom of speech is particularly

important in a university setting. *See, e.g.*, *Healy v. James,* 408 U.S. 169, 180 (1972) ("The college classroom with its surrounding environs is peculiarly the marketplace of ideas . . . .") (internal quotation marks omitted); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools [of higher learning]."). As the Supreme Court has emphasized, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. State of N.H.*, 354 U.S. 234, 250 (1957). The Supreme Court has also specifically held that speech in an educational environment may not be curtailed simply because some observers find the conclusions offensive or even abhorrent. *See Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 871 (1982) (finding it unconstitutional to remove books from a school library because the school board opposed the content of those books). The Complaint's suggestion that UC should have been particularly restrictive of speech because of the relative youth of some students on campus is thus entirely contrary to well established First Amendment principles. *See Brown v. Entm't Merchs. Ass'n*, -- S. Ct. --, No. 08-1448, 2011 WL 2518809, at *5 (June 27, 2011) (the state's "power to protect children from harm . . . does not include a free-floating power to restrict the ideas to which children may be exposed").

### b. Courts have found university speech codes to be unconstitutional.

Even to the extent that some of the speech in question expressed hostility to Jews rather than solely addressing political issues of public concern, it is unlikely that UC could have prohibited or punished the speech without running afoul of the First Amendment. Courts have repeatedly struck down "speech codes" that universities developed and implemented in response to racially motivated incidents—codes that penalized various forms of hateful speech such as "insults, epithets, ridicule, or personal attacks," *Roberts v. Haragan*, 346 F. Supp. 2d 853, 872 (N.D. Tex. 2004), or speech "'stigmatizing or victimizing' individuals or groups on the basis of race, ethnicity, religion, sex, sexual orientation, creed, national origin, ancestry, age, marital status, handicap or Vietnam-era veteran status." *Doe*, 721 F. Supp. at 853. Indeed, every reported

1    decision of which we are aware that has considered a speech code enacted at a public university

2    has struck down the policy as incompatible with the First Amendment. *See Reed*, 523 F. Supp. 2d

3    1005; *Roberts*, 346 F. Supp. 2d 853; *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357 (M.D. Pa.

4    2003); *Dambrot v. Cent. Mich. Univ.*, 839 F. Supp. 477 (E.D. Mich. 1993), *aff'd*, 55 F.3d 1177

5    (6th Cir. 1995); *UWM Post, Inc. v. Bd. of Regents of the Univ. of Wisc. Sys.*, 774 F. Supp. 1163

6    (E.D. Wisc. 1991); *Doe*, 721 F. Supp. 852.[8]

7    Of course, to the extent speech constitutes a "true threat," it is not protected by the First

8    Amendment. The Supreme Court has defined "true threats" as "those statements where the

9    speaker means to communicate a serious expression of an intent to commit an act of unlawful

10   violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343,

11   359 (2003). In addition, advocacy of the use of force or illegal activity may be prohibited if "such

12   advocacy is directed to inciting or producing imminent lawless action and is likely to incite or

13   produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). But Plaintiffs have not

14   alleged that the speech alleged in the Complaint met either of these criteria. Plaintiffs allege

15   neither that the speakers were seriously threatening violence toward an individual or group of

16   individuals nor that the speakers were inciting imminent illegal activity.[9]

17   While the alleged shopping cart incident would constitute an act of violence, Plaintiffs do

18   not allege that law enforcement authorities failed to respond to this incident or that UC failed to

19   ──────────────────────
20   [8] *See also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.) (striking down a public school district's anti-harassment policy); *Iota Xi Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F.2d 386 (4th Cir. 1993) (holding that George Mason University

21   could not discipline fraternity for holding an "ugly woman contest" despite university's substantial interest in maintaining an educational environment free of discrimination and racism

22   and providing a gender-neutral education); *Corry v. Leland Stanford Junior Univ.*, No. 740309 (Cal. Sup. Ct. Feb. 27, 1995) (striking down Stanford's speech code under a California statute

23   providing that private university students have the same right to exercise their free speech on campus as they enjoy off campus).

24   [9] Plaintiffs allege that "[i]n October 2000, the president of UCLA's MSA led a crowd of demonstrators at the Israeli consulate in chants of . . . 'Death to the Jews!'" (Compl. ¶ 43.) In the

25   context of a peaceful demonstration outside a consulate, this statement does not constitute a "true threat." Even if it were a threat, the demonstration did not occur on a UC campus, and Plaintiffs

26   do not allege that the individual in question was acting in his or her capacity as UCLA's MSA president, or that the protest was organized by UCLA's MSA. Given that, it is unclear what

27   Plaintiffs think UC could or should have done about it. In addition, this alleged demonstration occurred long before either Felber or Maissy was enrolled at UC. Apparently, the only reason

28   Plaintiffs (or their counsel) know about the incident is that it "was reported on publicly." (*Id.*)

1   discipline Zakharia for it. Moreover, the Complaint explicitly alleges that, after the other alleged

2   incident in which "Zakharia assaulted a Jewish UCB student," "Zakharia and two other SJP

3   activists were cited for battery by UC Campus Police." (Compl. ¶ 41.) Thus, the alleged

4   "deliberate[] indifferen[ce]" upon which Plaintiffs base their Title VI claim (*id.* ¶ 81) appears to

5   refer merely to UC's failure to prevent speech that UC could not have prohibited or punished

6   without violating the speakers' First Amendment rights.

### c.    The Supreme Court and the United States Department of Education have recognized that there can be no liability for refraining from prohibiting protected speech.

9   Consistent with the clear principle that public universities cannot constitutionally restrict

10  student speech, both the Supreme Court and the Department of Education have recognized that

11  protected First Amendment speech cannot constitute actionable harassment for which an

12  educational institution may be liable. The Supreme Court noted in *Davis* that "it would be entirely

13  reasonable for a school to refrain from a form of disciplinary action that would expose it to

14  constitutional or statutory claims." 526 U.S. at 649. Justice Kennedy cautioned explicitly in his

15  dissent in *Davis* that "[a] university's power to discipline its students for speech that may

16  constitute harassment is . . . circumscribed by the First Amendment." *Davis*, 526 U.S. at 667-68

17  (Kennedy, J., dissenting); *see also id.* ("A number of courts have already confronted difficult

18  problems raised by university speech codes designed to deal with peer sexual and racial

19  harassment. The difficulties associated with speech codes simply underscore the limited nature of

20  a university's control over student behavior that may be viewed as . . . harassment.") (internal

21  citations omitted).

22  Similarly, the U.S. Department of Education Office for Civil Rights (OCR) issued

23  investigative guidance in 1994 to explicate their policy and approach to investigating racial

24  incidents and harassment at educational institutions. Department of Education, Racial Incidents

25  and Harassment Against Students at Educational Institutions; Investigative Guidance (Mar. 10,

26  1994), 59 Fed. Reg. 11448. The guidance emphasizes that Title VI is directed at "conduct that

27  constitutes race discrimination . . . *and not at the content of speech*. In cases in which verbal

28  statements or other forms of expression are involved, consideration will be given to any

implications of the First Amendment to the United States Constitution." 59 Fed. Reg. at 11448

n.1 (emphasis added); *see also id.* at 11450 n.7 ("Of course, OCR cannot endorse or prescribe

speech or conduct codes or other campus policies to the extent that they violate the First

Amendment to the United States Constitution.").

In addition, the OCR published a letter in 2003 in response to the speech code cases

reiterating that OCR does not interpret Title VI to reach speech protected by the First

Amendment. Gerald A. Reynolds, Office for Civil Rights, First Amendment: Dear Colleague

(July 28, 2003), *available at* http://www.ed.gov/about/ offices/ list/ocr/firstamend.html ("No

OCR regulation should be interpreted to impinge upon rights protected under the First

Amendment to the U.S. Constitution or to require recipients to enact or enforce codes that punish

the exercise of such rights."). The OCR confirmed that Title VI is concerned with discriminatory

*conduct*, not speech: "Harassment, . . . to be prohibited by the statutes within OCR's jurisdiction,

must include something beyond the mere expression of views, words, symbols, or thoughts that

some person finds offensive. Under OCR's standard, the conduct must also be considered

sufficiently serious to deny or limit a student's ability to participate in or benefit from the

educational program." *Id.*

Here, if it had disciplined students for engaging in most of the speech described in the

Complaint, UC would potentially have been subject to liability for violating students' First

Amendment rights. UC cannot be liable under Title VI for refraining from doing what is

prohibited by the First Amendment. Plaintiffs' Title VI claim should therefore be dismissed.

> **2. <u>Plaintiffs' Title VI claim also fails because Plaintiffs do not allege that Defendants were deliberately indifferent to severe, pervasive, and objectively offensive harassment of them or of Jewish students generally.</u>**

Plaintiffs claim that UC violated Title VI because it was deliberately indifferent to what

Plaintiffs allege was harassment by other students on the basis of their Jewish ancestry and

affiliation. (Compl. ¶ 81.)[10] In *Davis*, the Supreme Court held that recipients of federal funding

---

[10] Title VI of the Civil Rights Act of 1964 provides that no person shall "on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The United States Department of Education Office for Civil Rights has issued

may be liable under Title IX for student-on-student harassment "only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650. The Supreme Court has repeatedly emphasized that Title VI is to be given the same interpretation and construction as Title IX, because Title IX was intentionally patterned after Title VI and has nearly identical wording. *See, e.g.*, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998) (Title IX "was modeled after Title VI . . . , which is parallel to Title IX except that it prohibits race discrimination, not sex discrimination, and applies in all programs receiving federal funds, not only in education programs."); *Fitzgerald v. Barnstable Sch. Comm.*, 129 S. Ct. 788, 797 (2009); *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 694-96 (1979). Accordingly, Courts evaluating Title VI claims of student-on-student harassment after *Davis* have held that its standard applies to race-based harassment under Title VI as well.[11] *See, e.g.*, *Whitfield v. Notre Dame Middle Sch.*, No. 09-2649, 2011 WL 94735, at *3 (3d Cir. Jan. 12, 2011) ("A plaintiff may recover [under Title VI] for alleged 'severe, pervasive, and objectively offensive' student-on-student harassment if the school 'acts with deliberate indifference to known acts of harassment.'" (citing *Davis*, 526 U.S. at 648)); *Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928, 934 (10th Cir. 2003) ("[T]he district court is directed to apply to the Plaintiffs' Title VI deliberate indifference claims the standard for a Title IX deliberate

---

a "Dear Colleague" letter interpreting Title VI's prohibition of discrimination on the basis of race or national origin to prohibit discrimination on the basis of anti-Semitism. *See* Russlyn Ali, Office for Civil Rights, Dear Colleague Letter (Oct. 26, 2010), *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.html, at 5. The UC Defendants do not challenge that interpretation for purposes of this Motion.

[11] The year before *Davis* was decided, the Ninth Circuit held in *Montiero v. Tempe Union High School District*, 158 F.3d 1022, 1032-33 (9th Cir. 1998), that a school district's failure to adequately respond to student-on-student racial harassment constituted a violation of Title VI. While *Montiero*'s central holding that student-on-student harassment claims are actionable under Title VI remains undisturbed after *Davis*, at least two elements of the test articulated in *Montiero* conflict with the *Davis* standard. First, while *Davis* requires "severe, pervasive, *and* objectively offensive" harassment, 526 U.S. at 650, *Montiero* had held that conduct need be only "severe, pervasive, *or* persistent." 158 F.3d at 1033. Second, *Davis* requires the school district to have actual knowledge of the harassment, 526 U.S. at 650, while *Montiero* had held that the school district's knowledge could be actual or constructive. 158 F.3d at 1034. The *Davis* standard has implicitly overruled *Montiero* on these two points.

1    indifference claim as previously articulated and applied by the Supreme Court in *Davis*."). Under

2    that standard, Plaintiffs fail to state a Title VI claim.

3           **a.    Plaintiffs fail to state a Title VI claim because they have not
                    pleaded facts sufficient to state a claim that UC acted with
4                   deliberate indifference.**

5           Plaintiffs have not pleaded facts sufficient to support a claim that Defendants were

6    deliberately indifferent to the alleged incidents that involved threats or violence rather than

7    protected speech. In *Gebser*, the Supreme Court held that recipients of federal funding may be

8    liable under Title IX only for "deliberate indifference to known acts of" sexual harassment. 524

9    U.S. at 290-91. An educational institution acts with deliberate indifference only where its

10   response to known peer harassment "is *clearly unreasonable* in light of the known

11   circumstances." *Davis*, 526 U.S. at 648 (emphasis added); *see also Williams ex rel. Hart v. Paint*

12   *Valley Local Sch. Dist.,* 400 F.3d 360, 368 (6th Cir. 2005). The Supreme Court has made clear

13   that this is "not a mere reasonableness standard," but a heightened standard that requires the

14   defendants' conduct to have been "not clearly unreasonable." *Davis*, 526 U.S. at 649. The

15   Supreme Court has further stressed that student victims of harassment are not entitled to make

16   "particular remedial demands" about how their school should have responded to the harassment,

17   and that "[c]ourts should refrain from second-guessing the disciplinary decisions made by school

18   administrators." *Id.* at 648. Ultimately, a federal funding recipient cannot be liable for an

19   inadequate response to peer harassment unless the institution "has made 'an official decision . . .

20   not to remedy [a] violation.'" *Oden v. Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006)

21   (quoting *Gebser*, 524 U.S. at 290).

22          Plaintiffs have not alleged facts sufficient to support an inference that the University

23   failed, in a manner that was clearly unreasonable, to respond to incidents that involved threats or

24   violent conduct rather than protected speech. Plaintiffs allege only a handful of such incidents

25   occurring over a period of 15 years. Plaintiffs themselves admit that the University responded to

26   three of those incidents. (Compl. ¶ 41 (Zakharia was cited for the battery by UC campus police);

27   *id.* ¶ 49 (UC campus police responded to a "riot" after a concert that was part of an Israel event

28   was disrupted); *id.* ¶ 54 (UC campus police escorted disruptive protestors out of a pro-Israel

1    talk)). Plaintiffs do not allege that the University failed to respond to Zakharia's alleged assault

2    on Ms. Felber with a shopping cart, (*id.* ¶ 18) or to two other violent acts alleged to have occurred

3    years before Felber and Maissy were students at UC Berkeley. (*Id.* ¶ 44.) Plaintiffs claim that UC

4    issued no "effective condemnation" in response to an alleged incident in 1995 in which a Jewish

5    observer was spat on by a demonstrator at a rally supporting Hamas, but Plaintiffs do not allege

6    that either the victim or the perpetrator was a UC student or that UC failed to respond at all—

7    even if it did not respond in the manner Plaintiffs would have chosen. (*Id.* ¶ 42.) Moreover,

8    Plaintiffs affirmatively allege that UC Berkeley's Dean of Students Poullard held "meetings with

9    both Tikvah and SJP about the conflict on campus." (*Id.* ¶ 21.)

10
11              **b.      Plaintiffs cannot recover under Title VI because the incidents
                          they describe cannot reasonably be viewed as harassment of
                          them or others for being Jewish.**

12              Under the Supreme Court's decision in *Davis*, in addition to establishing a subjective

13    perception of harassment, plaintiffs must show that the complained of conduct was "*objectively*

14    offensive.*" Davis*, 526 U.S. at 633. Titles IX and VI borrow the "hostile environment" standard

15    from Title VII cases involving hostile environments in the workplace. *Saxe v. State Coll. Area*

16    *Sch. Dist.*, 240 F.3d 200, 205 (3d Cir. 2001); *Papelino v. Albany Coll. of Pharm. of Union Univ.*,

17    633 F.3d 81, 89 (2d Cir. 2011) ("[A] Title IX hostile education environment claim is "governed

18    by traditional Title VII 'hostile environment' jurisprudence."). In the Title VII context, the

19    Supreme Court has held that, in order to constitute harassment under a hostile environment

20    theory, conduct must be objectively severe and pervasive such that a reasonable person would

21    agree that it is harassment. *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21-22 (1993); *see also Oncale*

22    *v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) ("[T]he objective severity of

23    harassment should be judged from the perspective of a reasonable person in the plaintiff's

24    position, considering all the circumstances.") (internal quotation marks omitted).

25              A reasonable person would not believe that criticism of Israel is harassment at all, let

26    alone harassment of Jewish students for being Jewish. In *Finkelshteyn v. Staten Island University*

27    *Hospital*, 687 F. Supp. 2d 66 (E.D.N.Y. 2009), the court rejected a Jewish plaintiff's claim that a

28    co-worker's comments that Israelis "needed to leave the country they were fighting in" created a

1    hostile work environment, finding that the comment instead represented a "disagree[ment] with

2    [plaintiff's] position on volatile geo-political issues." *Id.* at 78; *see also id.* at 82 (holding that a

3    comment that "Israelis should leave Gaza" was not a sign of anti-Semitism).

4         The incidents that Plaintiffs allege were harassment include political demonstrations,

5    publications, and academic events critical of Israel and supportive of Palestinians. (Compl. ¶¶ 27-

6    29, 45-49, 56). They also include disruption of speakers perceived to be pro-Israel or anti-Muslim

7    (*id.* ¶¶ 29, 53, 54). Criticism of Israeli policies and support for Palestinian self-determination,

8    particularly in a university setting, does not constitute harassment of Jewish students on the basis

9    of their religious ancestry and affiliation. Incidents such as heckling during a film "about the rise

10   and dangers of radical Islam" (*id.*) or disruption of a concert by draping Palestinian flags across

11   the stage at "an Israel event" (*id.* ¶ 49), while perhaps disruptive and impolite, are not even

12   alleged to have been directed at Plaintiffs or any other Jewish student on the basis of their Jewish

13   background. These alleged events cannot reasonably be characterized as racially-motivated

14   harassment and therefore cannot support a Title VI student-on-student harassment claim.

15        The only incidents alleged to have been targeted at either Plaintiff are Zakharia's alleged

16   spitting at Felber and his later allegedly "assaulting" her with a shopping cart. (*Id.* ¶¶ 18, 21.)[12]

17   Even if Defendants had been deliberately indifferent to these incidents, which the Complaint does

18   not allege (as the Complaint is silent about whether Zakharia was arrested and about whether UC

19   initiated student disciplinary proceedings against him), these isolated incidents would not

20   constitute harassment sufficiently pervasive to violate Title VI. *See Davis*, 526 U.S. at 652-53

21   ("Although in theory, a single instance of sufficiently severe one-on-one peer harassment could

22   be said to have [the systemic effect of denying the victim equal access to an educational program

23   or activity] we think it unlikely that Congress would have thought such behavior sufficient to rise

24   to this level in light of the inevitability of student misconduct and the amount of litigation that

25

26   _____

27   [12] Although Plaintiffs alleges that Zakharia assaulted another Jewish student at UC Berkeley on
     November 2008 (*id.* ¶ 41), Plaintiffs do not allege that the assault was motivated by the fact that
28   the student was Jewish. Nor does the Complaint allege that Plaintiffs were personally aware of
     the incident, instead basing the allegation only "on information and belief." (*Id.*)

1  would be invited by entertaining claims of official indifference to a single instance of one-on-one

2  peer harassment.").

3                  **c.**          **Most incidents alleged in the Complaint were not witnessed by**

**Plaintiffs, occurred long ago, or are not similar to acts that**

4  **Plaintiffs personally experienced.**

5         Plaintiffs cannot base a Title VI claim on events of which they were not aware when they

6  were UC students and which are not proximate in time or similar to incidents they personally

7  experienced. Again, Title IX and Title VI borrow the "hostile environment" standard from Title

8  VII cases involving hostile environments in the workplace. *Saxe*, 240 F.3d at 205; *Papelino*, 633

9  F.3d at 89. In the Title VII context, courts may consider "harassing acts [that] were directed at

10  others or occurred outside of the plaintiff's presence," but only if the "plaintiff bec[ame] aware

11  *during the course of his or her employment*" of that harassment. *Hawkins v. Anheuser-Busch,*

12  *Inc.*, 517 F.3d 321, 336 (6th Cir. 2008) (emphasis added); *see also, e.g.*, *King v. McMillan*, 594

13  F.3d 301, 310 (4th Cir. 2010) (testimony of others was relevant to the 'severe or pervasive'

14  element only if [the plaintiff] "was aware of [the harassment described in the testimony] during

15  the course of her employment"); *Schwapp v. Town of Avon,* 118 F.3d 106, 111-12 (2d Cir. 1997).

16         Correspondingly, alleged acts of harassment that happened outside of Plaintiffs' presence

17  are potentially relevant to their Title VI claim only if they were aware of them while they were

18  students at UC Berkeley. Felber is no longer a student at UC (Compl. ¶ 3), and the Complaint

19  does not allege that Felber was aware of the incidents it describes—other than the alleged

20  shopping cart and spitting incidents in which she was involved (*id.* ¶¶ 18-21)—while she was a

21  student at UC. Although Maissy is a current student and presumably now knows about the

22  incidents described in the Complaint, the only incident at which Maissy is alleged to have been

23  present is the alleged barbed wire incident (*id.* Ex. A ¶¶ 3-13), which affected a student other than

24  Maissy himself.

25         In addition, past acts of harassment directed at other individuals are potentially relevant

26  only if they occurred close in time to incidents that plaintiffs personally experienced. *Hawkins*,

27  517 F.3d at 337 ("[T]he appropriate weight to be given a prior act will be directly proportional to

28  the act's proximity in time to the harassment at issue in the plaintiff's case."). Here, many of the

1   alleged incidents occurred long before Plaintiffs enrolled at UC Berkeley.[13] Plaintiffs claim that

2   they were harassed by incidents that occurred as early as 1995, when Felber would have been

3   only five years old and Maissy even younger. (Compl. ¶ 42; *see also id.* ¶¶ 27-28, 43-47, 54).[14]

4           Moreover, incidents of harassment directed at others are potentially relevant to a hostile

5   environment claim, regardless of timing, only if they are "similar" to acts of harassment that have

6   been experienced directly by the plaintiff. *Hawkins*, 517 F.3d at 336-37. Thus, courts have

7   considered acts of harassment directed at individuals other than the plaintiff to be relevant only if

8   they are similar to those suffered by the plaintiff herself. *E.g.*, *King*, 594 F.3d at 306-08 (female

9   sheriff was repeatedly sexually harassed and sexually assaulted); *Schwapp*, 118 F.3d at 108 ("the

10  four central incidents" of racial harassment all occurred in the presence of the plaintiff, an

11  African-American police officer). Here, Maissy has not alleged *any* harassment directed at him

12  personally; the only event at which he even claims to have been present is a single "Apartheid

13  Week" political demonstration. (Compl. Ex. A (Decl. of Brian Maissy.)) Felber has alleged only

14  that Zakharia "assaulted" her with a shopping cart on one occasion (*id.* ¶ 18) and spat at her

15  during a political rally on another. (*Id.* ¶ 21.)  All of the other incidents alleged in the Complaint

16  were either distant in time or dissimilar in character to the two incidents involving Zakharia and

17  Felber, so all of the other incidents are entirely irrelevant to Plaintiffs' Title VI claim. The alleged

18  shopping cart and spitting incidents are not "severe and pervasive" enough to provide a basis for a

19  deliberate indifference claim.  *See Davis*, 526 U.S. at 652-53.

20          **3.      Plaintiffs fail to state a Title VI claim because they have not alleged
                      that they were denied educational benefits or opportunities.**

21          Plaintiffs fail to state a Title VI claim for the additional reason that they have not alleged

22  they were denied access to any educational benefits or opportunities. To satisfy the *Davis*

23

24  _____

25  [13] Several of the alleged incidents of harassment did not occur at UC Berkeley at all, making them
    completely irrelevant to Plaintiffs' claims about the purported atmosphere at UC Berkeley. (*Id.*
26  ¶¶ 29, 43, 45, 46.) For example, Plaintiffs object to a news magazine that was published at UCLA
    and UC Irvine but which they do not even allege was distributed at Berkeley. (*Id.* ¶ 46.)

27  [14] Ms. Felber also alleges that she was harassed by events that occurred after she graduated in
    December 2010. (*Id.* ¶¶ 29, 40.) Ms. Felber's ability to access educational benefits and
28  opportunities at the University of California could not have been affected by incidents that
    occurred after she was no longer a student there.

1    standard, harassment must "deprive victims of access to the educational opportunities or benefits

2    provided by the school." 526 U.S. at 650. This requirement is not a mere technicality but is

3    essential to the purpose of Title VI, which was enacted to provide recourse to individuals who

4    were excluded on the basis of race from entities receiving federal funds. *See Cannon*, 441 U.S. at

5    704 & n.64.

6          In order to be actionable under Title VI, the alleged conduct must have a "concrete,

7    negative effect on [the plaintiff's] ability to receive an education." *Davis*, 526 U.S. at 654. Courts

8    have recognized three types of impediments to a plaintiff's access to education in the Title IX

9    context: physical exclusion from educational facilities, *e.g.*, *Montgomery v. Indep. Sch. Dist. No.*

10   *709*, 109 F. Supp. 2d 1081, 1094 (D. Minn. 2000), poor academic performance, *e.g.*, *Jennings v.*

11   *Univ. of N.C.*, 482 F.3d 686 (4th Cir. 2007), and absence, withdrawal, or suspension from school,

12   *e.g.*, *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F.3d 1282, 1298-99 (11th Cir. 2007);

13   *Vance v. Spencer County Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000); *Murrell v. Sch. Dist.*

14   *No. 1*, 186 F.3d 1238, 1248-49 (10th Cir. 1999). Absent one of these concrete effects on a

15   plaintiff's access to educational opportunities, discomfort about the alleged harassment does not

16   constitute a denial of access to an education.

17         For example, in *Gabrielle M. v. Park Forest-Chicago Heights, IL School District 163*, 315

18   F.3d 817 (7th Cir. 2003), the Seventh Circuit held that there is no evidence that [the plaintiff] was

19   denied access to an education," because "[a]lthough [the plaintiff] was diagnosed with some

20   psychological problems, the record show[ed] that her grades remained steady and her absenteeism

21   from school did not increase." *Id.* at 823. In *Hawkins v. Sarasota County School Board*, 322 F.3d

22   1279 (11th Cir. 2003), plaintiffs testified that they were upset as a result of the alleged harassment

23   and even faked being sick several times to avoid going to school. *Id.* at 1289. The Eleventh

24   Circuit held that these facts "[fell] short of demonstrating a systemic effect of denying equal

25   access to an educational program or activity," given the fact that the students' grades did not

26   suffer and their teachers did not observe any change in their classroom demeanor. *Id.*; *see also*

27   *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010) (a student was not denied equal access to

28   an education where her grades did not suffer, she was not absent from school, and she graduated

1    with a high class rank).[15]

2            Plaintiffs have alleged that, after the alleged shopping cart incident, Felber was fearful to

3    walk on campus alone. (Compl. ¶ 20.)[16] Maissy likewise states in his declaration—though not in

4    the Complaint itself—that he does "not feel safe on . . . campus because of the actions of a few

5    radical groups." (*Id.* Ex. A ¶ 18.) These general claims are not accompanied by any specific

6    allegations sufficient to establish that Plaintiffs' access to educational benefits or opportunities

7    was actually impaired. Plaintiffs have not alleged that any purported harassment caused them to

8    be physically excluded from any educational opportunities. Nor have they alleged that the

9    purported harassment detracted from their academic performance, caused them to miss classes,

10   caused them to withdraw from school, or prevented them from completing graduation

11   requirements on schedule. (*See id.* ¶ 15 (noting that Felber has graduated).)

12           One outlier case suggests that an allegation that a plaintiff's extreme fear for his physical

13   safety and well-being effectively barred his access to educational opportunities and benefits and

14   so was sufficient to meet his pleading burden. *See Ray v. Antioch Unified Sch. Dist.*, 107 F. Supp.

15   2d 1165, 1171 (N.D. Cal. 2000). But Plaintiffs have not met even this more lenient standard. In

16   *Ray*, a middle school student had been "repeatedly threatened, insulted, taunted, and abused"

17   throughout the school day and during school activities. *Id.* at 1167. After the student's parents

18   complained to the school and the school took no action, the student was assaulted, "causing a

19   concussion, hearing impairment in one ear, severe and permanent headaches, and severe

20   psychological injury." *Id.* In contrast to the permanent physical injury and severe psychological

21   damage suffered in *Ray*, Plaintiffs' conclusory allegations here about fearfulness on campus do

---

[15] *See also Milligan v. Bd. of Trustees*, No. 09- 320, 2010 WL 2649917, at *10 (S.D. Ill. June 30, 2010) (despite the fact that plaintiff felt "uncomfortable and distracted" as a result of harassment, there was no concrete, negative effect on his education where there was no impact on the classroom learning environment, his grades did not drop, and he was not substantially absent from class); *Burwell v. Pekin Cmty. High Sch. Dist. 303*, 213 F. Supp. 2d 917, 932 (C.D. Ill. 2002) (even if the harassment plaintiff was subjected to caused her to receive a lower grade in a single class, her educational experience was not undermined where she was on the honor roll and graduated with her class).

[16] Given that Plaintiffs allege that Felber obtained a permanent restraining order against Zakharia (Compl. ¶ 20)—the only student that the Complaint suggests ever did anything threatening toward her—precisely what she feared, or what more she believes UC could conceivably have done concerning Zakharia, is unclear.

1   not describe an objectively reasonable fear for their personal safety. By Plaintiffs' own

2   allegations, Felber obtained a protective order against Zakharia (Compl. ¶ 20), and nothing in the

3   Complaint explains why Maissy would reasonably fear for his safety.

4           **E.    Felber Lacks Standing to Seek Injunctive Relief.**

5           Felber does not have standing to seek injunctive relief in federal court as a remedy for any

6   of her claims. In order to have standing to seek an injunction, a plaintiff must allege a "likelihood

7   of substantial and immediate irreparable injury," *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974),

8   that is "real and immediate, not conjectural or hypothetical." *City of Los Angeles v. Lyons*, 461

9   U.S. 95, 102 (1983). In *Lyons*, the Supreme Court held that a plaintiff who had been placed in a

10  chokehold by a police officer did not have standing to sue the police department for injunctive

11  relief, because there was no real or immediate threat that he would suffer future injury from the

12  use of chokeholds by police officers. *Id.* at 105. Because Felber is no longer a student at UC

13  Berkeley, it is similarly unlikely here that Felber would be a victim of an attack on that campus

14  again, and she no longer experiences the purportedly hostile campus environment. (Compl. ¶ 15).

15  Plaintiffs' allegation that Felber "contemplate[s] graduate studies at the University," (*id.* ¶ 79), is

16  too speculative to confer standing.

17          On similar facts, the Eleventh Circuit held that a student who withdrew from the

18  University of Georgia as a result of an alleged sexual assault lacked standing to pursue injunctive

19  relief under Title IX. *Williams*, 477 F.3d at 1303. The court held that the threat of future harm to

20  plaintiff was merely conjectural because neither the plaintiff nor the alleged assailants currently

21  attended the university. *Id.* Although the plaintiff alleged that she might return if the university

22  adopted a more protective sexual harassment policy, the court held that this contingency was "too

23  conjectural to warrant injunctive relief." *Id.*

24          **F.    Plaintiffs' State Law Claims Should Be Dismissed.**

25          Given that all of Plaintiff's federal claims should be dismissed, this Court should decline

26  to exercise supplemental jurisdiction over Plaintiffs' state law claims. In the alternative, the Court

27  should dismiss Plaintiffs state law claims because: (1) Plaintiffs' free exercise claim under the

28  California Constitution presents novel questions of state law, so the Court should abstain from

UC DEFENDANTS' NOTICE OF MOT.
AND MOT. TO DISMISS
CASE NO. 11-CV-01012- RS

1    deciding it; (2) Plaintiffs' Unruh Act claim fails because UC is not a business establishment

2    within the meaning of that Act; and (3) Plaintiffs' Government Code claim fails because it seeks

3    only injunctive and declaratory relief, and the UC Defendants have immunity in federal court

4    from claims for injunctive and declaratory relief based on violations of state law.

5              **1.    Plaintiffs' state law claims should be dismissed for lack of
                       supplemental jurisdiction.**

6

7         For the reasons discussed above, all of Plaintiffs' federal law claims (the first, third, and

8    sixth claims for relief in the Complaint) should be dismissed. Once Plaintiffs' federal claims are

9    dismissed, this Court should decline to exercise supplemental jurisdiction over the remaining state

10   law claims (the second, fifth, and seventh claims for relief in the Complaint). *See* 28 U.S.C.

11   § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . .

12   if . . . the district court has dismissed all claims over which it has original jurisdiction").[17] The

13   Supreme Court has recognized that, "in the usual case in which all federal-law claims are

14   eliminated before trial, the balance of factors to be considered under the pendent jurisdiction

15   doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to

16   exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484

17   U.S. 343, 350 & n.7 (1988) (interpreting the statement in *United Mine Workers of America v.*

18   *Gibbs*, 383 U.S. 715, 726 (1966), that "if the federal claims are dismissed before trial . . . the state

19   claims should be dismissed as well"). There is no reason here to depart from this well-established

20   default rule. Significant federal judicial resources have not yet been expended on the state law

21   claims.

22            **2.    This Court should abstain from exercising jurisdiction over the
                      California free exercise claim because it raises novel questions of state
                      law.**

23

24        Plaintiffs' second claim for relief—under the free exercise clause in article I, section 4 of

25   the California Constitution—presents novel questions of California law regarding the elements of

26   _____
     [17] The fourth claim for relief, which apparently seeks declaratory relief for alleged violations of
     the First Amendment to the United States Constitution and California Constitution Article I,
27   section 4 (the California free exercise clause) is redundant with claim 1 (First Amendment), claim
     2 (California free exercise clause), and claim 3 (§ 1983), so the discussion above of those claims
28   also explains why the fourth claim should be dismissed.

1  the claim and the availability of damages.[18] The presence of these novel questions of state law is

2  an additional reason for dismissal. Under 28 U.S.C. § 1367(c)(1), "district courts may decline to

3  exercise supplemental jurisdiction over a [state law] claim . . . if the claim raises a novel or

4  complex issue of State law." *Id.* Accordingly, federal courts routinely dismiss claims that turn on

5  novel questions of state law. *See, e.g.*, *Lee v. Wilkinson*, No. 09-00722, 2009 WL 2824758, at *7

6  (E.D. Cal. Sept. 1, 2009) (relying on § 1367(c)(1) and the *Pullman* abstention doctrine to decline

7  jurisdiction over a claim presenting a novel question of California law) (citing *R.R. Comm'n of

8  Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941)); *Creighton v. City of Livingston*, 628 F. Supp. 2d

9  1199, 1219 (E.D. Cal. 2009) ("[W]hether § 3 provides for a damages remedy has not been

10  addressed by California courts, presenting a novel issue . . . . This issue is best left to the

11  California courts.").

12  　　　Plaintiffs' California free exercise claim raises two novel and complex questions of

13  California law. First, what elements and standards govern such a claim has not yet been

14  determined by the California courts. The California Supreme Court has observed "that the

15  meaning of the California Constitution article I, section 4 . . . is not dependent on the meaning of

16  any provision of the federal Constitution." *Catholic Charities of Sacramento, Inc. v. Superior

17  Court*, 32 Cal. 4th 527, 560 (2004); *North Coast Women's Care Med. Group, Inc. v. Superior

18  Court*, 44 Cal. 4th 1145, 1158 (2008). But "[t]he California Supreme Court 'has never had

19  occasion to definitively construe' this clause." *Barnes-Wallace v. City of San Diego*, 607 F.3d

20  1167, 1175 (9th Cir. 2010) (quoting *E. Bay Asian Local Dev. Corp. v. California*, 24 Cal. 4th 693,

21  719 (2000)); *see also North Coast Women's Care*, 44 Cal. 4th at 1158 (recognizing that the

22  California Supreme Court has not "determined the appropriate standard of review for such a

23  challenge under the state Constitution's guarantee of free exercise of religion"). Because this

24  Court cannot confidently predict how the California Supreme Court will interpret California's

25  free exercise clause, it should decline supplemental jurisdiction and dismiss Plaintiffs' claim.

---

26  [18] The caption of the Complaint also lists sections 2 and 7 of Article I, but because neither of

27  those sections is mentioned in the body of the Complaint, the UC Defendants assume the only
   claim Plaintiffs are asserting under the California Constitution is a free exercise claim under

28  Article I, section 4.

1       Second, the California courts have never decided whether the California free exercise

2   clause creates a cause of action for money damages. In *Katzberg v. Regents of the University of*

3   *California*, 29 Cal. 4th 300 (2002), the California Supreme Court expressed skepticism about

4   recognizing new constitutional torts for money damages. The court noted, for example, that both

5   the U.S. Supreme Court and California courts have refused for more than twenty years to

6   recognize any new money damages actions for constitutional violations. *Id.* at 308, 311. The court

7   then laid out a stringent and lengthy analysis that must be undertaken before any new

8   constitutional tort is created. *Id.*

9       In *Khatib v. County of Orange*, No. 07-1012, 2008 WL 822562 (C.D. Cal. Mar. 26, 2008),

10  the Central District of California dismissed plaintiffs' claim for money damages under article I,

11  section 4 of the California Constitution, acknowledging that "The California Courts have not yet

12  addressed whether such a private suit for monetary damages is available under Article I, Section 4

13  of the California Constitution." *Id.* at *11. The court explained its decision to decline to exercise

14  supplemental jurisdiction:

15          In addition to being a matter of first impression, and therefore novel, the
            determination of whether a private action for money damages exists also appears
16          complex. It would involve careful consideration of the intention of the state
            legislature, a delicate balancing of existing state law remedies, and consideration
17          of the broader impact of such a constitutional tort. The Court finds it prudent to
            abstain from considering this important issue of California law in favor of
18          California courts.

19  *Id.* This Court should similarly dismiss Plaintiffs' California free exercise claim.

20              **3.    Plaintiffs' Unruh Act claim fails because UC is not a "business
                        establishment" within the meaning of that Act.**

21

22      Plaintiffs' fifth claim for relief, under California's Unruh Civil Rights Act, does not state a

23  claim because UC is not a "business establishment" within the meaning of that Act. *See* Cal. Civil

24  Code § 51. While no case has yet decided whether universities are "business establishments"

25  under the Act,[19] the closest case on point—*Doe v. California Lutheran High School Association*,

---

26  [19] This would also be a reason to abstain from exercising jurisdiction over Plaintiffs' Unruh Act
    claim. *See* section III.F.2 *supra*. In *Lee v. Wilkinson*, No. 09-00722, 2009 WL 2824758, at *7
27  (E.D. Cal. Sept. 1, 2009), the district court abstained of exercising jurisdiction over the plaintiff's
    Unruh Act claim against a state prison because the California courts had not decided whether
28  prisons were "business establishment[s]" under the Act.

170 Cal. App. 4th 828 (2009)—held that a private high school was not a business establishment, at least with regard to the school's admissions and disciplinary decisions. In *Doe*, two students were expelled from a private religious school because they were engaging in a same-sex relationship; they sued the school district under the Unruh Act, alleging that the school had discriminated against them on the basis of sexual orientation. *Id*. at 833. The court held that the school was not a "business establishment" subject to the Act. *Id*. at 840. The *Doe* court implied that a school might engage in some transactions that would make it a "business establishment" for purposes of those transactions, such as selling football tickets to the public or holding golf tournaments to raise funds for the school. *Id*. at 839. It distinguished, however, between such commercial transactions with non-members and admissions or disciplinary decisions that are central to the overall purpose and function of the school. *Id*.; *see also Curran v. Mount Diablo Council of the Boy Scouts*, 17 Cal. 4th 670, 700 (1998) (holding that the Boy Scouts could be a business, and hence prohibited from discriminating, with respect to nonmember transactions, and yet not be a business, and hence not be prohibited from discriminating, with respect to its membership decisions); *cf. Marin Mun. Water Dist. v. Chenu*, 188 Cal. 734, 738 (1922) ("It is not to be presumed that the Legislature undertook to place public corporations . . . in the same class as private corporations engaged in ordinary business. The rule of construction we have already referred to forbids it.").

Here, Plaintiffs' allegations put the University of California clearly outside the business establishment category. Plaintiffs challenge what they claim was UC's failure to adequately discipline its students and the extent to which UC acts as an open public forum for student speech, however unpopular. These aspects of UC's affairs are entirely non-commercial in character, relate to the internal affairs of the university, and are directly related to its central educational purposes and functions. The Court should therefore dismiss Plaintiffs' claim under the Unruh Act because UC is not a "business establishment" within the meaning of the Act.

**4.     Plaintiffs' state law claims for injunctive and declaratory relief fail because the UC Defendants have Eleventh Amendment immunity.**

As discussed above, The Regents has sovereign immunity against any claims brought by

1   individuals in federal court, absent congressional abrogation or consent. *See* Section III.B.5,

2   *supra.* All of Plaintiffs' state law claims must be dismissed as against The Regents for this reason

3   alone.

4            In addition, the Individual Defendants have Eleventh Amendment immunity against all of

5   Plaintiffs' state law claims for injunctive and declaratory relief. *See Pennhurst State Sch. & Hosp.*

6   *v. Halderman,* 465 U.S. 89, 106 (1984) ("[I]t is difficult to think of a greater intrusion on state

7   sovereignty than when a federal court instructs state officials on how to conform their conduct to

8   state law. Such a result conflicts directly with the principles of federalism that underlie the

9   Eleventh Amendment."); *see also Air Transp. Ass'n of Am. v. Pub. Utils. Comm'n of State of*

10  *Cal.*, 833 F.2d 200, 203-04 (9th Cir. 1987) (dismissing claims for injunctive and declaratory relief

11  on the ground that, under *Pennhurst*, "[t]he eleventh amendment . . . bars claims in federal court

12  against state officials based on state law violations").

13           Because Plaintiffs' seventh claim for relief—under California Government Code

14  § 11135—seeks only injunctive and declaratory relief (Compl. 22:2), it must be dismissed against

15  the UC Defendants. *See Donovan v. Poway Unified Sch. Dist., 167 Cal. App. 4th 567, 595 (2008)

16  (stating that § 11139 "limit[ed] the remedies available in a private enforcement action [under

17  §11135] to equitable or injunctive relief"); *Pennhurst*, 465 U.S. at 106.

18  **IV.    CONCLUSION**

19           For the foregoing reasons, all of Plaintiffs' claims against the UC Defendants should be

20  dismissed.

21

22

23

24

25

26

27

28

UC DEFENDANTS' NOTICE OF MOT.
AND MOT. TO DISMISS
CASE NO. 11-CV-01012- RS

1    DATED: July 5, 2011                          MUNGER, TOLLES & OLSON LLP
                                                      BRADLEY S. PHILLIPS
2                                                     MICHELLE FRIEDLAND
                                                      KATHRYN EIDMANN
3

4                                                 By:_____/s/ *Michelle Friedland*_____
                                                          MICHELLE FRIEDLAND
5
                                                  Attorneys for Defendants
6                                                 MARK G. YUDOF; THE REGENTS OF
                                                  THE UNIVERSITY OF CALIFORNIA;
7                                                 ROBERT J. BIRGENEAU; JONATHAN
                                                  POULLARD
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28