**\*\*E-filed 12/22/11\*\***

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JESSICA FELBER and BRIAN MAISSY, | No. C 11-1012 RS |
| Plaintiffs, | |
| v. | **ORDER GRANTING MOTIONS TO DISMISS** |
| MARK G. YUDOF, PRESIDENT OF THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, et al., | |
| Defendants. | |

## I. INTRODUCTION

Sproul Plaza, on the campus of the University of California, Berkeley, was the birthplace of what came to be known as the Free Speech Movement in 1964. To this day, Sproul Plaza remains a place where students and others gather to engage in vigorous and sometimes contentious expressions of political speech. Plaintiffs in this action, one current and one former UC student, allege that certain individuals and organizations have repeatedly exceeded the boundaries of free speech, engaging in conduct that amounts to harassment, intimidation, threats, assault, and even battery, both on Sproul Plaza, and elsewhere on the Berkeley campus and other schools in the UC system.

In this action, plaintiffs seek to hold the University, certain of its administrators, and the Associated Students of the University of California ("ASUC") responsible for the actions of those

individuals and organizations, and to require defendants to adopt certain policies and rules purportedly designed to curtail wrongful conduct by such persons. Because plaintiffs have failed to allege facts supporting a claim that defendants have violated plaintiffs' constitutional or other legal rights, or that they have a legal duty to take further action to control the conduct of other persons, defendants' motions to dismiss[1] will be granted, with leave to amend in part.

## II. BACKGROUND[2]

Plaintiff Jessica Felber graduated from UC Berkeley in December of 2010. Plaintiff Brian Maissy remains enrolled as an undergraduate on the campus. Both describe themselves as being of "Jewish ancestry and religion." Plaintiffs allege that they have been subjected to harassment and intimidation from members of two student organizations, Students for Justice in Palestine ("SJP") and the Muslim Student Association ("MSA"), also known as the Muslim Students Union.

The centerpiece of the complaint's allegations of unlawful harassment involve an incident that took place during an event held annually on campus known as "Apartheid Week." Plaintiffs allege that Apartheid Week is organized by SJP and MSA in an effort to compare the policies of the State of Israel with those of South Africa between 1948 and 1993. Activities include setting up informational tables and distributing leaflets on Sproul Plaza, which plaintiffs acknowledge is "certainly protected free speech." Event organizers, however, also set up "check points," at which

---

[1] The Regents of the University of California and its officials named as individual defendants have filed one motion to dismiss. ASUC, represented by separate counsel, has filed another.

[2] The facts described in this section are taken from the allegations of the operative First Amended Complaint ("FAC"). In opposition to the motions to dismiss, plaintiffs have submitted several declarations, which defendants move to strike on grounds that they go beyond the pleadings and therefore cannot be considered in the context of motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and that some of them include material that would be irrelevant or otherwise inadmissible in any event. Defendants acknowledge, however, that the facts proffered in the declarations may be considered in evaluating whether or not plaintiffs should be given leave to amend. The motion to strike is granted insofar as the declarations have not been considered for purposes of evaluating the sufficiency of the existing complaint. The declarations have been reviewed, however, as an offer of additional facts plaintiffs would plead if given leave to do so.

students dressed as soldiers and carrying "realistic-looking" simulated "assault weapons" challenge passing students, demanding them to state whether they are Jewish or not.

During Apartheid Week in March of 2010, Felber was participating in an event called "Israel Peace and Diversity Week," organized by a campus group to present viewpoints "differing from 'Apartheid Week." Felber was holding a placard reading, "Israel wants Peace." Another student, Husam Zakharia, who has a leadership role in SJP, allegedly rammed a shopping cart into Felber intentionally, causing her physical injuries that required medical attention. Felber had previously encountered Zakharia more than a year earlier at a political rally. On that occasion, Zakharia allegedly spit at Felber and yelled, "you are disgusting." After these two incidents, Felber obtained a permanent restraining order from the Alameda County Superior Court requiring Zakharia to stay away from her, even on campus. For the remainder of the time Felber was enrolled at UC, however, she recounts being fearful to walk on campus alone.

Plaintiffs insist that this case is "about much more" than Zakharia's assault on Felber. They contend that defendants have tolerated the "development of a dangerous anti-Semitic climate" on UC campuses, and have failed to adopt policies, regulations, and procedures to protect Jewish students from threats, intimidation, and harassment by SJP and MSA. The complaint describes all of the following incidents, and the response to those incidents by UC authorities.

- In 1995, MSA conducted a rally on the Berkeley campus in support of Hamas. Students carried signs depicting the Israeli flag with a swastika in the middle, and some expressly volunteered to serve as future suicide bombers. A Jewish observer was spit on by a demonstrator. Defendants allegedly issued no effective condemnation.

- In October of 2000, the president of the UCLA chapter of MSA led a crowd of demonstrators at the Israeli consulate in chanting, "Death to Israel" and "Death to the Jews."

- The first Apartheid Week with a mock checkpoint on the Berkeley Campus was staged by SJP in 2001. Although condemned by the campus newspaper as violating the campus Code of Conduct, similar events were permitted to continue in subsequent years. Defendants allegedly have "done nothing to prevent the continuance of these hostile 'checkpoints'" despite complaints from many students.

3

- In April of 2001, SJP demonstrators were arrested after a six-hour "siege" of a campus building.
- In December of 2001, a member of Chabad, a Jewish religious group at UC Berkeley was assaulted near the Chabad house. The following spring, a window of the house was smashed and graffiti stating, "Fuck the Jews" was painted on the wall.
- In May of 2002, a demonstration sponsored by JSP and MSA at UC Irvine featured mock "body bags" of Palestinians claimed to have been murdered by the Israeli army.
- In April of 2002, newsmagazines published by JSP and MSA at UCLA and UC Irvine jointly circulated a magazine that was highly-critical of Israel and laudatory of Hamas and Hezbollah.
- In 2004, SJP activists disrupted a lecture by Middle East scholar Daniel Pipes, until ejected by campus police.
- In 2007, SJP activists disrupted a speech by author Nonie Darwishspoke, until ejected by campus police.
- In March of 2008, SJP sponsored a "die-in," in which 30-40 protestors lay on the ground in Sproul Plaza, obstructing foot traffic. Demonstrators' signs accused Israel of starting another Holocaust, and equated Israelis to Nazis. SJP demonstrators have blocked and tried to destroy signs of Jewish students attempting to conduct peaceful counter-protests.
- In November of 2008, during an "Israel event," SJP protestors disrupted a concert, by draping two Palestinian flags from a balcony over the stage. Campus police responded to the resulting "riot."
- In January of 2011, SJP and MSA protestors were disruptive at a speech given by the Israeli ambassador, resulting in indictments brought against eleven students by the Orange County District Attorney.
- In May of 2011, during Apartheid Week, a disabled student's wheelchair became entangled in the simulated barbed wired used at a "checkpoint." When plaintiff Maissy reported observing this incident to defendant Jonathan Poullard, Dean of Student Affairs, the response he

received was that although the disabled student had a "moment of difficulty" in passing the barricades, campus police observed that SJP members quickly assisted him.

Defendants in this action are the Regents of the University of California; the President of the Regents, Mark G. Yudoff, the Chancellor of UC Berkeley, Robert J. Birgenau; Dean of Students at UC Berkeley, Jonathan Poullard, and; ASUC. The SJP and MSA chapters at Berkeley are both registered as student organizations. As such, they are entitled to, and do, apply for and receive funding from ASUC.

## III. LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While "detailed factual allegations are not required," a complaint must include sufficient facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 US 544, 570 (2007)). A claim is facially plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims alleged in the complaint. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal under Rule 12(b)(6) may be based either on the "lack of a cognizable legal theory" or on "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). When evaluating such a motion, the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-moving party. *Twombly*, 550 US at 570). "[C]onclusory allegations of law and unwarranted inferences," however, "are insufficient to defeat a motion to dismiss for failure to state a claim." *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140 (9th Cir. 1996); *see also Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 US at 555 ("threadbare recitals of the elements of the cause of action, supported by mere conclusory statements," are not taken as true).

IV.  DISCUSSION

A.  Constitutional Claims

The first claim for relief of the FAC purports to be brought under the First Amendment of the Constitution and asserts that defendants have violated plaintiffs' right to the free exercise of religion, by "failing to adequately secure and monitor the hostile campus environment."  The third claim for relief invokes 42 U.S.C. §1983 to assert that defendants deprived plaintiffs of their right to exercise their religion and their freedom of assembly.  As §1983 provides the mechanism for individuals to assert a private right of action for Constitutional violations, the first claim for relief is effectively subsumed in the third.

As an initial matter, nothing in the FAC shows any deprivation of plaintiffs' "freedom of assembly" at all.  Additionally, from the facts presently alleged, it is far from clear that any person interfered with plaintiffs' free exercise of religion.  Nevertheless, even assuming that plaintiffs have alleged, or could amend to allege, sufficient acts of harassment and intimidation directed against them based on their religion to be deemed as an interference with their free exercise of that religion, they simply have no basis for pursuing such constitutional claims against defendants.  With exceptions not implicated here, state actors have no constitutional obligation to prevent private actors from interfering with the constitutional rights of others.  *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 196 (1989) (holding that the purpose of the Due Process clause was "to protect the people from the State, not to ensure that the State protected them from each other."); *cf. Davis v. Monroe County Bd. of Educ.,* 526 U.S. 629, 639-640 (1999) (finding potential *statutory* liability for school's "deliberate indifference" towards preventing student-on-student sexual harassment).

Plaintiffs insist that federal courts have jurisdiction to, and routinely do, order educational and other institutions to adopt policies and procedures to protect First Amendment rights of individuals.  Plaintiffs, however, have misread the precedents on which they rely.  For example, plaintiffs contend that *Saxe v. State College Area School. Dist.*, 240 F.3d 200 (3rd Cir. 2001) "cogently and accurately" states the law applicable here.  In *Saxe*, the plaintiffs were challenging the constitutionality of an "Anti-Harassment Policy" adopted by a state college with the stated goal of

"providing all students with a safe, secure, and nurturing school environment." 240 F.3d at 202. Although the court was careful to avoid implying that restrictions on "harassment" will never pass constitutional muster, *id* at 209-210, it ultimately held that the particular policy in dispute was unconstitutionally overbroad. *Id.* at 219. *Saxe* summarized the limits on a school's right to limit speech as follows: "[1] a school may categorically prohibit lewd, vulgar or profane language . . . [2] a school may regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern . . . [3] Speech falling outside of these categories . . . may be regulated only if it would substantially disrupt school operations or interfere with the right of others." *Id.* at 214.

Thus, *Saxe* at most stands for the proposition that a school district *may* adopt a speech and conduct code provided it is drawn narrowly enough not to infringe on First Amendment rights. Nothing in *Saxe* implies, much less holds, that a school has a constitutional *obligation* to attempt to craft and to adopt a code regulating speech that walks that narrow constitutional line. *See also LaVine v. Blaine School District* 257 F.3d 981 (9th Cir. 2001) (reviewing constitutionality of disciplinary action taken against student for writing poem with violent imagery; no implication that school had constitutional obligation to impose discipline); *College Republicans at San Francisco State v. Reed,* 523 F.Supp.2d 1005 (ND Cal. 2007) (analyzing constitutionality of existing Student Conduct Code; no implication of constitutional obligation to adopt such a code).

Accordingly, plaintiffs have failed to allege a tenable federal constitutional claim, and there is no basis to believe they could do so by alleging additional or different facts. The first and third claims for relief of the FAC are therefore dismissed without leave to amend.

B. Title VI

Title VI of the 1964 Civil Rights Act, 42 U.S.C §§ 2000d *et seq*. provides that, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or

activity receiving Federal financial assistance."[3] Title VI, thus provides at least a theoretical basis on which the University could be required to regulate the conduct of other students, unlike plaintiffs' purported constitutional claims. *See Davis,* 526 U.S. at 643-644.[4] To bring such a claim, however, plaintiffs would have to allege conduct that is, "so severe, pervasive, and objectively offensive that it denies its victims the equal access to education" that the statute is designed to protect, and that the University acted with "deliberate indifference" towards that conduct. *Id.* at 652.

The allegations of the FAC do not satisfy these requirements for several reasons. First, a very substantial portion of the conduct to which plaintiffs object represents pure political speech and expressive conduct, in a public setting, regarding matters of public concern, which is entitled to special protection under the First Amendment. *Snyder v. Phelps*, 131 S. Ct. 1207, 1219 (2011). "Such speech cannot be restricted simply because it is upsetting or arouses contempt. . . . '[T]he point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful.'" *Id*. at 1219 (*quoting Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc*., 515 U.S. 557, 574 (1995)). Plaintiffs expressly acknowledge that setting up informational tables and distributing leaflets on Sproul Plaza is protected speech, and yet they appear to be attempting to draw an untenable line that would remove from protection signs and publications that are critical of Israel and supportive of Hamas and Hezbollah. That protestors' signs may have contained language that plaintiffs believe was inflammatory, offensive, or untrue, does not warrant a different result. *See Snyder*, 131 S. Ct. at 1217 (signs bearing messages such as "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "You're Going to Hell," which may "fall short of refined social or political commentary," nonetheless entitled to First Amendment protection, thereby foreclosing claim for infliction of emotional distress).

---

[3] Defendants do not dispute that plaintiffs' identification as Jewish brings them within the scope of Title VI's protections.

[4] *Davis* involved Title IX, which prohibits discrimination based on sex, with language substantively identical to that in Title VI.

Second, a broad swath of the conduct alleged occurred at times and in places where plaintiffs were not present. While such conduct may, to the extent plaintiffs were actually aware of it, have some extremely marginal relevance to plaintiffs' contention that they perceived a hostile environment, acts occurring years before plaintiffs ever enrolled at UC Berkeley, and/or on different campuses entirely, does little to demonstrate that plaintiffs suffered severe and pervasive harassment.

Next, plaintiffs have not alleged facts showing that they were denied access to the University's educational services in any meaningful sense. Despite the fact the Sproul Plaza likely serves as an important campus thoroughfare and gathering place, it is not even clear that activities on Sproul Plaza or at Sather Gate necessarily would significantly impede any student's access to the educational services offered by the University, regardless of the nature of those activities. The incident in which Felber was assaulted with a shopping cart, for example, did not occur in the context of her educational pursuits. Rather, that event occurred when she, as one person attempting to exercise free speech rights in a public forum was allegedly attacked by another person who likewise was participating in a public protest in a public forum.

Finally, plaintiffs fail to show how defendants have acted with "deliberate indifference" in ignoring wrongful conduct otherwise not amounting to protected speech. To the contrary, plaintiffs have alleged facts that campus police have made arrests of disruptive protestors, and that the administration has engaged in an ongoing dialogue with the opposing parties in an attempt to ensure that the rights of all persons are respected, and to minimize the potential for violence and unsafe conditions. That the University may not have acted as plaintiffs would prefer does not rise to "deliberate indifference."[5]

It is far from clear that plaintiffs will be able to allege facts sufficient to make out the elements of a claim under Title VI. The additional facts they have offered by declaration with their

---

[5] As one example, plaintiffs fault Dean Poullard for asking Felber whether she had been spit *on* or merely spit *at*, and for appearing to take the matter less seriously when she acknowledged that she had not been spit on. As offensive as spitting *at* someone may be, it very well could constitute protected expressive conduct, depending on the precise circumstances, whereas spitting *on* someone much more likely could rise to an assault or battery, criminally punishable or civilly actionable.

9

1 opposition to this motion would not suffice to overcome the deficiencies noted. Nevertheless, in
2 light of the liberal policy favoring amendment under Rule 15 of the Federal Rules of Civil
3 Procedure, plaintiffs may amend their claim under Title VI against the Regents of the University of
4 California and the individually named officials.[6]

### C. ASUC

The FAC alleges no facts that would support any claim under federal law against ASUC. Not only do the constitutional claims fail for the reasons set forth above, even assuming some basis otherwise existed to charge defendants with the responsibility for controlling the behavior of third parties, plaintiffs also have shown no reason such responsibility would lie with ASUC. Plaintiffs have not challenged that ASUC distributes funding to all eligible student organizations on a content-neutral basis, and have not shown that it could restrict funding to SJP and MSA without running afoul of serious First Amendment issues. Finally, with respect to Title VI, ASUC is neither a recipient of federal funding nor the entity to which plaintiffs claim to have been denied access. Leave to amend the claims under federal law as to ASUC is therefore denied.

### D. State Law Claims

As urged by defendants, the Court declines to reach the viability of plaintiffs' claims under state law unless and until there is a viable federal claim stated. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction where it "has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 351 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy,

---

[6] The University's motion to dismiss initially asserted that the individual defendants could not be liable under Title VI. On reply, however, defendants concede it might be possible to hold individuals liable for any Title VI violations via a claim under Section 1983. Plaintiffs should name the individual defendants in any amended complaint only if they have a good faith legal and factual basis to do so.

10

convenience, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims.").

## V. CONCLUSION

The motions to dismiss are granted. Leave to amend is granted only as to the claim under Title VI against the Regents of the University of California, and as to the individual defendants in the event it can properly be restated as a Section 1983 claim. Because the Court has not reached the state law claims, those claims may also be repleaded in any amended complaint, as against any or all of the present defendants.

Any amended complaint shall be filed within 20 days of the date of this order. In the event plaintiffs elect not to amend, and to pursue their state claims in state court, they shall file a notice to that effect within the same time period, and the case will then be dismissed in its entirety, without prejudice as to the state law claims.

IT IS SO ORDERED.

Dated: 12/22/11

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE